

G. L. Jones, of Asheville, N. C. (Jones & Ward and Bourne, Parker & Jones, all of Asheville, N. C., on the brief), for appellant.

J. G. Merrimon and John S. Adams, both of Asheville, N. C. (Merrimon, Adams & Adams, of Asheville, N. C., on the brief), for appellees.

Before NORTHCOTT and SOPER, Circuit Judges, and WAY, District Judge.

SOPER, Circuit Judge.

Lawrence S. Holt, Jr., brought suit in the state court against the executors of the will of E. W. Grove, complaining that the executors had violated the terms of a contract made between him and the testator in regard to the sale of two lots of ground in the city of Asheville, N. C. The suit was removed, on the ground of diversity of citizenship, to the federal court, where the District Judge, being of the opinion that Holt had no right of recovery, dismissed the bill of complaint.

The evidence tended to prove the following state of facts: Grove was a man of high character and ability, possessed of a large fortune and actively engaged in business. Amongst other properties, he owned large

**HOLT v. ST. LOUIS UNION TRUST CO. et al.**

**No. 3173.**

Circuit Court of Appeals, Fourth Circuit.

Oct. 15, 1931.

tracts of land in North Carolina, and in 1924 and 1925, he was engaged in developing real estate on Battery Park Hill in the city of Asheville. Several blocks of land in the heart of the city were involved. One of these, situated to the south of the Battery Park Hotel, which Grove also owned, he chose as the site of an arcade building, 396 feet by 184 feet in dimension, designed to contain 84 stores and 125 offices, and estimated to cost a million and a half dollars. The actual construction of the arcade was begun in the early part of 1926.

To the south of the arcade building, and separated therefrom by a public street, lay another block of land which Grove had subdivided into building lots, and had placed on the market for sale. He also owned numerous other properties in Buncombe county in and around the city of Asheville, and it was estimated that at the time of his death his real estate holdings in this locality were worth ten millions of dollars. He held the notes of purchasers of land in North Carolina in the amount of two and a half to three millions of dollars. On December 17, 1924, Holt bought one of the lots in the block south of the arcade building for $1,350 per front foot, or an aggregate price of $33,750, and Grove agreed, as part of the consideration moving from him, not to sell any other lots in the same block for less than $1,350 per front foot. On August 27, 1925, Holt bought a similar lot adjoining the one first purchased by him on the same terms. He gave in payment for the two lots his promissory notes payable at various dates thereafter.

Grove died on January 27, 1927. No lots in the block in question had been sold for less than the agreed price during his lifetime; but in May, 1928, the executors of his estate filed suit in the superior court of Buncombe county against his heirs at law and the devisees under his will, and secured a decree of court for the sale of certain real property in Buncombe county belonging to the Grove estate, including the arcade building then in course of construction. This decree was signed upon allegations to the effect that Grove had large indebtedness in North Carolina and elsewhere which exceeded the value of his personal estate, eliminating from the calculation the value of stock and contracts of a corporation which Grove had requested in his will should not be sold. Having secured the court's order, the executors made sale of the unfinished arcade building and also

of lots adjoining Holt's in the same block at the prevailing market price which was less than Holt had paid. In the meantime, Holt had made substantial payments on account of the purchase price of his lots. Believing that he was injured by the failure of the executors to maintain the price of the lots, he brought suit to secure a rescission of the contracts of sale by cancellation of his unpaid promissory notes, together with the deeds of trust securing them, repayment of the money already paid by him on account of the purchase price, and a reconveyance of the lots by him to the Grove estate.

Holt contends that the executors were bound by the terms of the contracts as effectually as Grove was bound in his lifetime, under the general rule that unless a contractual obligation is personal in character, the death of the obligor will not discharge it. Williston on Contracts, § 1945. On the other hand, the executors set up the defenses that the obligation was highly personal, and did not survive Grove's death; that the sale by them was not made voluntarily but under the compulsion and authority of the decree of the court, and that the plaintiff had suffered no injury by their acts; and in any event, that rescission or cancellation was not the proper remedy.

The controversy must be disposed of by an interpretation of the meaning of the contract. As we have seen, it fixes no period for the duration of Grove's obligation to maintain the price of his lots. If it must be taken literally, the obligation is perpetual; but in our opinion, it is not reasonable to give it this significance. It could hardly be contended, for instance, that the obligation would have persisted even if Holt had sold one of his lots at a reduced price. The ordinary rule is that a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract. James Maccalum Printing Co. v. Graphite Compendius Co., 150 Mo. App. 383, 130 S. W. 836; Anderson v. Wainwright, 67 Ark. 62, 53 S. W. 566. On this subject, Williston on Contracts, § 38, says:

"It is not often that a promise will properly be construed as calling for perpetual performance. Only in such negative promises as to forbear suit or not to carry on a business or occupation is so broad a construction likely to be permissible. More commonly the true construction will mean some period short of infinity; and partly in

order to carry out supposed actual intention of the parties and partly, doubtless, in order to prevent an offer or agreement from being ineffectual because too indefinite, courts will, where the contract contemplates a single act or exchange of acts unless the circumstances show a contrary intention, construe a promise which does not in terms state the time of performance as intending performance in a reasonable time. * * *

"Where the agreement contemplates a continuing performance, the matter is not so clear; but a promise to forbear suit is interpreted, in the absence of circumstances showing that perpetual forbearance, or forbearance for some other time was intended as calling for forbearance for a reasonable time. In many cases, however, a promise which contemplates continuing performance for an indefinite time has been construed as stipulating only for performance terminable at the will of either party. Thus an agreement to lease, without limitation of time, imposes no obligation. Though such agreements while wholly executory create no obligation, if either party performs, he will be entitled to compensation according to the terms of the agreement. · Cases may also arise where the parties have so·far attempted to define the time of performance as to preclude the court from applying its own standard, and yet have not made such exact definition as to enable the agreement to be enforced. Nevertheless not infrequently promises requiring continuing performance (other than contracts of service) have been construed as requiring performance for a reasonable time, or until terminated by a reasonable notice. All the circumstances of each case must be considered in reaching a conclusion."

A very similar agreement not to sell land for less than a certain price was considered in Rackemann v. Riverbank Improvement Co., 167 Mass. 1, 44 N. E. 990,·57 Am. St. Rep. 427. The case differs from ours in the important circumstance that the promisor was still in existence when the breach of contract took place. But the court held that the agreement was to be construed in view of the circumstances, and, no limit of time being fixed, it would only last for a reasonable length of time. See, also, Mississippi River Logging Co. v. Robson (C. C. A.) 69 F. 773; Carnig v. Carr, 167 Mass. 544, 46 N. E. 117, 35 L. R. A. 512, 57 Am. St. Rep. 488.

We think that the contract in the present suit was not terminable at the will of either party; but that, on the other hand, it was intended to last only for a reasonable time, having regard for all the circumstances, and not perpetually. It expired, in our view, with the death of Grove. The promise was exacted from him as the sole owner not only of the block of lots in question, but also of the surrounding property. ·He was a man of great wealth, able to withhold his property from sale during an unfavorable market, and willing to do so because he was engaged in extensive development and construction in the neighborhood. The parties to the contract undoubtedly contemplated the continued control by Grove of the scheme of development, for this circumstance not only furnished a motive for his promise, but the means of carrying it into effect. When this is borne in mind, we cannot reasonably construe the obligation as continuing after Grove had died. Then a distribution of his estate must necessarily take place, the assets would no longer be under a single control, and there would be no certainty that the scheme of development as Grove conceived it would be pushed to a final conclusion. Indeed, the case presents a strong similarity to those in which it has been held that the contract contemplated personal services on the part of the promisor and therefore expired at his death. But we need not go so far in this case, for it may be said with truth that the continued control and development of the property was not an express element in the contract. Nevertheless it was a circumstance so closely connected with the performance of the contract and so prominently in the minds of the contracting parties that it inevitably affects the determination of what was a reasonable period for the obligation to continue in force.

The decree of the District Court is affirmed.