[S. F. No. 22382. In Bank. Nov. 26, 1968.]

CONSOLIDATED THEATRES, INC., Plaintiff, Cross-defendant, and Respondent, v. THEATRICAL STAGE EMPLOYEES UNION, LOCAL 16 et al., Defendants, Cross-complainants and Appellants.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

714

716

Bodkin, Breslin & Luddy, Michael G. Luddy, Harry A. Olivar and Henry G. Bodkin, Jr., for Defendants, Cross-complainants and Appellants.

Angell, Adams, Gochnauer & Holmes, Angell, Adams & Holmes, Samuel L. Holmes and Andrew H. Field for Plaintiff, Cross-defendant and Respondent.

SULLIVAN, J.—Defendant union and other defendants appeal from a judgment (1) permanently enjoining them from attempting to induce plaintiff theatre corporation to employ members of the union at one of its theatres except in accordance with a certain alleged agreement; (2) awarding plaintiff theatre corporation damages in the amount of $27,841; and (3) adjudging that defendants should take nothing by reason of their cross-complaint in the action.

Plaintiff Consolidated Theatres, Inc. (Consolidated), a California corporation, owns and operates the Royal Theatre (Royal) in San Francisco, and has done so since the days of silent motion pictures. In the late 1920's when films with sound tracks began to be exhibited in San Francisco theatres, Consolidated and other theatre owners sought to eliminate as employees musicians whose services had been used in connection with silent films. A labor controversy thereupon arose between the several theatre owners on the one hand, and the musicians union on the other. Other theatrical unions joined in the dispute and ensuing picketing; among these was Local 16 of the Theatrical Stage Employees Union[1] (Local 16), the primary defendant herein. The Royal was one of the theatres picketed.

In March of 1931, Consolidated and another theatre owner filed an action against the unions involved, including Local 16, and obtained an injunction pendente lite prohibiting picketing. Prior to trial a settlement of the controversy was reached, and counsel for Consolidated prepared a document reflecting the elements of the understanding that had been achieved. This document was entitled "MEMORANDUM OF MISCELLANEOUS ELEMENTS THAT SHOULD ENTER INTO SETTLEMENT OF DIFFERENCES BETWEEN NASSER BROS.[2] AND MUSICIANS UNION, ET AL." and, although it was itself never formally executed by any

[1] Local 16 was at the time of this early dispute, and is at the present time, chartered by the International Alliance of Theatrical Stage Employees, an international union affiliated with the AFL-CIO.

[2] The Nasser brothers were, and are, the owners of Consolidated.

of the interested parties, it formed the basis of agreements subsequently executed by the plaintiff and some defendants prior to dismissal of the lawsuit.[3] It appearing that two of the unions involved, namely Local 16 and the local branch of the janitors union, did not make it a practice to enter into formal written agreements, they were not required to do so as a condition of dismissal. However, upon the insistence of plaintiffs, on March 6, 1931, they executed and delivered to their own atttorney a letter stating: "You are authorized to state on behalf of the undersigned Unions that the terms embodied in the memorandum entitled 'Memorandum of miscellaneous elements that should enter into settlement of differences between Nasser Bros., and Musicians Union, et al.' correctly set forth the understanding as to the undersigned unions, . . ."[4] The memorandum referred to remained unsigned. After the settlement had been completely effected, all of the unions involved announced to the public that all differences had been adjusted in a fair and equitable manner and that the public should resume its patronage of the theatres involved, to wit, the Royal and Alhambra Theatres owned by Consolidated, and the Castro Theatre owned by the other plaintiff in the suit.

The 1931 memorandum made only two specific references to Local 16. The first, which provided that the union sign a release of claims against the plaintiffs in the dismissed action, is not here in issue. The second is found in section 8 of the memorandum and provides: "8. The following additional covenants are to be included as part of the adjustment . . . (c) That no stage hands shall be required to be employed at the Castro Theatre. (d) That with reference to the employment of stage hands by the owners and operators of the Alhambra and Royal Theatres, it shall be understood that the same conditions shall prevail as to each of said theatres as prevailed on March 1, 1929, namely, that if any stage presentations are offered for the public at the Alhambra Theatre, one stage hand shall be employed." The memorandum gave no indication as to how long its provisions should be in effect.

As time passed, and the emphasis in the entertainment industry shifted from live theatrical productions to talking mo-

---

[3] Among the provisions of the memorandum was one to the effect that the injunction pendente lite (which has not been made a part of the record in the instant case) should be made permanent. However, no steps were taken to this end; instead the action was dismissed.

[4] Certain provisos were attached, none of which is here relevant.

tion pictures, persons who had worked as stagehands in the usual sense came to perform the function of maintenance men in motion picture theatres. Local 16, whose jurisdiction included such maintenance men, developed a policy whereby theatres which regularly showed ''first-run'' motion pictures were required to employ maintenance men; the union's definition of ''first run'' apparently did not include so-called ''art,'' ''sex,'' or ''foreign'' films. At the time of trial herein 31 members of Local 16 were employed as maintenance men in various San Francisco theatres.

The Royal at no time, either before or after the 1931 memorandum, employed stagehands or maintenance men, and maintenance tasks were performed either by the managers, or in the case of substantial repairs, by independent contractors employing union labor.

Until 1959 the Royal was unable to obtain first-run pictures and operated as a neighborhood subsequent-run theatre. In 1959, however, after antitrust litigation had rendered first-run pictures available to neighborhood theatres, the Royal began to show first-run pictures on an occasional basis. In 1962, after the theatre had been extensively renovated, the Royal began to show first-run pictures on a more regular basis.

In January 1963, after another first-run theatre operator had complained that the Royal had a competitive advantage over theatres which had maintenance men, Local 16 met with Consolidated and requested that maintenance men be employed at the Royal when first-run pictures were shown.[5] Consolidated, observing that since the renovation of the theatre very little maintenance work had been required, declined to comply with this request on the ground that it had no need for the services in question. In the course of subsequent discussions Consolidated called attention to the provision of the 1931 memorandum which we have set forth above and took the position that that provision was still in effect and wholly governed the rights of the parties. As early as April of 1963, Local 16 expressed its disagreement with this position and, on the advice of its attorney, took the contrary position that the 1931 memorandum had no presently binding effect. When subsequent

[5] It appears that Local 16's contract covering its 31 maintenance men in first-run theatres was due for renegotiation in March of 1964, and that the management of some of the theatres having such maintenance men had informed Local 16 that the contract as to existing maintenance men would be in jeopardy unless all first-run theatres, and specifically the Royal, were required to have maintenance men.

communications from Local 16 yielded no concession from Consolidated, strike sanction was requested. After an unsuccessful attempt at mediation by an official of the San Francisco Labor Council, strike sanction was granted and picketing began on November 27, 1963. All of the union-member employees of the theatre refused to cross the picket line and the theatre was closed.

The signs carried by the pickets stated ''This Theatre Does Not Operate on the Union Contract with UNION LOCAL #16 I.A.T.S.E. Theatrical Stage Union A.F. OF L. and C.I.O.'' While picketing was in progress the Royal exhibited signs which stated ''Royal Theatre PICKETED DUE TO THE FEATHER-BEDDING DEMANDS OF THE STAGEHANDS UNION (ALL OUR EMPLOYEES ARE UNION MEMBERS).'' The theatre ran newspaper advertisements to the same effect. Eventually, on December 24, 1963, the Royal reopened on a subsequent-run basis.

On December 9, 1963, Consolidated brought the instant action against Local 16 and two of its agents. The complaint set forth three causes of action: the first alleged breach of the 1931 ''contract''; the second alleged that the statement made on the pickets' signs constituted a libel; and the third alleged that the union's picketing activities were illegal in that they constituted a tortious interference with Consolidated's business and a violation of the so-called Hobbs Anti-Racketeering Act. (18 U.S.C.A. § 1951.)[6] As amended, the complaint prayed that an injunction issue permanently enjoining Local 16 and its agents from attempting by picketing or other means to coerce or induce Consolidated to employ members of Local 16 at the Royal so long as it was operated without a stage; that compensatory damages in the amount of $60,000 be awarded; and that exemplary damages in the amount of $100,000 be awarded.

Local 16 filed a cross-complaint against Consolidated, alleging that the sign exhibited by the latter at the time of the picketing, together with newspaper advertisements to the same effect, constituted a libel whereby Local 16 was damaged in the amount of $100,000. The union also sought exemplary damages in the amount of $50,000.

---

[6]The Hobbs Anti-Racketeering Act renders liable to federal criminal sanctions anyone who ''in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, . . .'' The Act goes on to specifically define the terms ''robbery,'' ''extortion,'' and ''commerce.''

After a nonjury trial judgment was entered in favor of Consolidated consisting of a permanent injunction substantially in the terms of the prayer, together with an award of compensatory damages in the amount of $27,841. It was further adjudged that Local 16 should take nothing by its cross-complaint.

Local 16 and its two individually named agents, as defendants and cross-complainants, appealed from the judgment.

■ We are met at the threshold of our determination with the union's contention that the trial court lacked jurisdiction in the premises because the controversy is subject to the jurisdiction of the National Labor Relations Board (Board) and it has not been demonstrated that the Board has declined or would decline to assert such jurisdiction. Although this contention was not raised before the trial court,[7] its jurisdictional nature requires that we consider it for the first time on appeal. (*Russell* v. *Electrical Workers Local 569* (1966) 64 Cal.2d 22, 28, fn. 5 [48 Cal.Rptr. 702, 409 P.2d 926]; see *Emery* v. *Pacific Employers Ins. Co.* (1937) 8 Cal.2d 663, 665-666 [67 P.2d 1046]; *Costa* v. *Banta* (1950) 98 Cal.App.2d 181, 182 [219 P.2d 478]; see 1 Witkin, Cal. Procedure (1954) Jurisdiction, § 6, pp. 278-279.)[8]

We have today had occasion to review the law governing the necessary accommodation of state jurisdiction to that of the Board as set forth in the federal Labor Management Relations Act (Act) and relevant decisions construing that Act. (See *Musicians Union* v. *Superior Court, ante,* p. 695, at pp. 700-706 [73 Cal.Rptr. 201, 447 P.2d 313].) ■ ■ In summary, we have observed that the Act, whose primary aim is to promote the full flow of commerce, reposes in the Board the power "to prevent any person from engaging in any unfair labor practice . . . affecting commerce. . . ." (29 U.S.C.A § 160(a)); and that "when an activity is *arguably* subject to" those sections of the Act which define such an unfair labor practice, "the States as well as the federal courts must defer to the exclusive competence of the . . . Board" (italics added) (*San Diego Bldg. Trades Council* v. *Garmon* (1959) 359

[7]Local 16 is represented on appeal by attorneys different from those who represented it at the trial.

[8]The case of *Thorman* v. *International Alliance etc. Employees* (1958) 49 Cal.2d 629 [320 P.2d 494]), is overruled insofar as it holds or suggests that jurisdictional defects due to federal preemption under the Act may be waived through failure to raise them at the trial court level and may not be raised for the first time on appeal (p. 633).

U.S. 236, 245 [3 L.Ed.2d 775, 783, 79 S.Ct. 773]) and are therefore ousted of jurisdiction to proceed unless and until *either* (1) the Board actually declines to assert jurisdiction over the dispute as it may in cases "where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." (29 U.S.C.A. § 164 (c)(1)), *or* (2) it is shown by the party seeking to invoke state jurisdiction that the Board would decline to assert jurisdiction if application were made to it (*Russell* v. *Electrical Workers Local 569, supra,* 64 Cal.2d 22).

These basic rules are pertinent to the instant case. Also pertinent, however, is an exception to these rules which is not involved in the *Musicians Union* case. Section 301(a) of the Act (29 U.S.C.A. § 185(a)) provides in relevant part: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . may be brought in any district court of the United States having jurisdiction of the parties. . . ." In *Smith* v. *Evening News Assn.* (1962) 371 U.S. 195 [9 L.Ed.2d 246, 83 S.Ct. 267], it was held that a state court was not deprived of its jurisdiction over such a suit by the fact that the conduct complained of would constitute an unfair labor practice within the jurisdiction of the Board. ■ "The authority of the board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts under § 301." (371 U.S. at p. 197 [9 L.Ed.2d at p. 249].) (See also *Retail Clerks Union* v. *Thriftimart, Inc.* (1963) 59 Cal.2d 421, 423-425 [30 Cal. Rptr. 12, 380 P.2d 652].)

Consolidated takes the position that this rule is applicable to the instant case, and that the trial court therefore had jurisdiction in the premises *whether or not* the Board also had jurisdiction. Since a resolution of this question in favor of Consolidated would render unnecessary inquiry as to the jurisdiction of the Board, we address ourselves to it first.

Local 16's primary[9] contention in this regard is that the

_____

[9]Local 16's additional contention that the so-called contract exception applies only to collective bargaining agreements is clearly without merit. "It is enough that [the contract be] an agreement between employers and labor organizations significant to the maintenance of labor peace between them." (*Retail Clerks* v. *Lion Dry Goods* (1962) 369 U.S. 17, 28 [7 L.Ed.2d 503, 510, 82 S.Ct. 541].) In view of the circumstances leading to the agreement here in question, there can be little doubt that

1931 agreement,[10] which was the purported basis of Consolidated's 1963 lawsuit, was no longer in force and effect at the time of that lawsuit. Therefore, it is urged, there was no contract (in the sense of a binding legal obligation) upon which to base the lawsuit in order to bring it within the scope of the exception.

In our consideration of this contention we first look to the language of the memorandum in order to determine the nature and extent of obligations created by the agreement at its inception. (See fn. 10, *ante.*) The memorandum states that as to the employment of "stage hands" at the two Consolidated theatres in question, the Alhambra and the Royal, "the same conditions shall prevail as to each of said theatres as prevailed on March 1, 1929. . . ." It then goes on to detail what those "conditions" were: ". . . if any stage presentations are offered for the public at the Alhambra Theatre, one stage hand shall be employed." Although specific mention is here made only of the Alhambra Theatre, the parties hereto have apparently agreed that the same "conditions" were to be applicable to the Royal. Thus interpreted the memorandum manifests an agreement that the Royal Theatre was to employ one "stage hand" when it offered stage presentations.

If for purposes of argument we accept Consolidated's broad reading of the term "stage hand" and substitute therefor "member of Local 16," we can reasonably infer that the agreement gave rise to the following correlative obligations on the part of the parties: (1) Consolidated was obligated to employ a member of Local 16 when it gave stage presentations at the Royal, but it was not so obligated when it did not; and (2) Local 16 was obligated to refrain from demanding employment of its members at the Royal when no stage presentations were being given there, but was not so obligated when they were.

it was a significant factor in settling the early controversy and that, as such, it was of importance in securing peaceful labor-management relations.

[10]Although the complaint alleges, and the trial court found, that a "written agreement" was entered into by the parties in 1931 and that such agreement was in full force and effect at the time of suit herein, the pretrial order characterizes the agreement in question merely as "a contract." In view of the conclusions which we shall hereafter reach regarding the present vitality of the 1931 agreement, we shall not here inquire as to the form of agreement or as to its vitality in 1931; instead we assume for the purpose of argument that in 1931 the parties entered into a then enforceable agreement all of whose terms were set forth in the "MEMORANDUM OF MISCELLANEOUS ELEMENTS. . . ."

Upon our hypothesis that there was an agreement between the parties (see fn. 10, *ante*), and that it imposed the foregoing obligations, we proceed to determine whether such agreement was in full force and effect at the time of the instant lawsuit. On this issue the parties are in sharp disagreement. Consolidated maintains that the trial court properly construed the 1931 agreement as a "permanent arrangement" and therefore one of unlimited duration. It therefore argues that we must uphold the court's finding that at all times since its execution on March 6, 1931 the agreement was in full force and effect and that eventually it was breached by the Union in 1963. The union, on the other hand, contends that the trial court misconstrued the agreement, that it must be interpreted as a contract for a reasonable time or terminable at will, and that it had expired or had been terminated prior to the activity complained of. ■ It is settled that "It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. ■ Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' " (see *Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865 [44 Cal. Rptr. 767, 402 P.2d 839].) It has not been contended that any of the extrinsic evidence relating to the contemplated duration of the 1931 agreement was in substantial conflict,[11] and we therefore undertake our own construction of the agreement as regards its duration.

■ We have observed that the memorandum makes no reference to the duration of the agreement as it relates to Local 16. Of course, the omission of provision for duration did not render the agreement fatally uncertain and indefinite. (See 1 Witkin, Summary of Cal. Law (1960) Contracts, § 43, pp. 50-51; 12 Cal.Jur.2d, Contracts, § 108, pp. 310-311.) However, such omission does require that the duration of the contract be judicially determined in accordance with established rules of construction. (*Haggerty* v. *Warner* (1953) 115 Cal. App.2d 468, 473 [252 P.2d 373], and cases there cited; see 17

[11]As we made clear in *Parsons*, the fact that conflicting inferences may be drawn from evidence *which is not itself in conflict* does not require that an appellate court accept the trial court's interpretation of the instrument based upon such evidence. (62 Cal.2d at p. 866; fn. 2.)

Am.Jur.2d, Contracts, § 486, pp. 955-957; 17A C.J.S., Contracts, § 385, p. 457.)

█ In construing contracts which call for continuing performance or forbearance but which contain no *express* term of duration, it is first necessary to determine whether the intention of the parties as to duration can be *implied* from the nature of the contract and the circumstances surrounding it. (See *Haggerty* v. *Warner, supra,* 115 Cal.App.2d 468, 473; *Mangini* v. *Wolfschmidt, Ltd.* (1958) 165 Cal.App.2d 192, 199-200 [331 P.2d 728]; 1 Williston on Contracts (3d ed. 1957) § 38, p. 112; 17 Am.Jur.2d, Contracts, § 486, p. 957; 17A C.J.S. § 385(1), p. 457.) Thus, in some cases the court by referring to the nature of the contract and the totality of circumstances is able to determine that the obligations of the contract were impliedly conditioned as to duration upon the occurrence or non-occurrence of some event or situation.

For example in the case of *Town of Readsboro* v. *Hoosac Tunnel & W. R. Co.* (2d Cir. 1925) 6 F.2d 733, plaintiff town and defendant company's predecessor in interest in 1888 entered into a contract whereby the latter was to erect a certain bridge for the purpose of accommodating a highway contemplated by plaintiff town and a railroad owned and operated by the company; it was also provided that costs of maintaining the bridge were to be borne equally by the town and the company. The contract had no express term of duration. The bridge was duly built, and the company and its successor in interest (defendant) paid half of the expenses of maintenance pursuant to the contract for some 20 years. In 1913 defendant company decided to change from narrow to standard gauge on its whole railroad, and since the bridge was too weak to bear standard gauge equipment, it removed its tracks therefrom and ceased to use the bridge for any purpose. The town subsequently determined to undertake substantial repairs to the bridge and called upon defendant company to bear half of the expenses; defendant refused to do so. In the ensuing action judgment was given for defendant company. The Circuit Court of Appeal, reversing the judgment on another ground, held that the 1888 contract, although it contained no express term of duration, was impliedly conditioned as to duration upon the company's continued use of the bridge for its railroad. The court, speaking through Judge Learned Hand, stated: "[The 1888 contract] was in terms unlimited in time, and the plaintiff apparently reasons that the defendant is bound for-

ever to pay one-half of the expenses of maintenance. This seems to us untenable. Had the parties expressed the intention to make a promise for perpetual maintenance, we should, of course, have nothing to say; their words would be conclusive. But they did not, and, as no time is expressly fixed, we must look to the circumstances to learn what they meant. Their purpose is pretty evident. The railroad was to have the use of the bridge, and in using it would help wear it out. It was reasonable, therefore, that it should share the expenses of its upkeep. But, if at any time that use ceased, plainly there was no reason, either in good sense or in justice, that it should continue to pay for what it got no use of, and what it no longer helped to destroy. The purpose can hardly have been to supply the town with a bridge forever. This we think was the measure of the original ovenant." (6 F.2d at p. 735.) (See and compare *Metal Associates* v. *East Side Metal Spinning & Stamping Corp.* (2d Cir. 1947) 165 F.2d 163.)

The application of this rationale in a labor-management context was shown in the case of *Morgan Drive Away* v. *International Brotherhood of Teamsters* (S.D. Ind. 1958) 166 F.Supp. 885, affd. (7th Cir. 1959) 268 F.2d 871, cert. den. 361 U.S. 896 [4 L.Ed.2d 152, 80 S.Ct. 199]. There the union defendants had prior to 1951 engaged in secondary boycott activities against plaintiff company, and the latter had filed an unfair labor practice charge with the Board. Before the Board had taken action on the charge, however, the parties had in 1951 entered into a "settlement agreement" wherein the unions agreed inter alia to cease secondary boycott activities against the company and the company agreed to withdraw the charge; said agreement was expressly made subject to the approval of the Board's regional director upon his being satisfied that the terms of the agreement had been carried out by the unions. There was no express term of duration. Apparently the union subsequently ceased the activities in question, the regional director gave his approval, and the charge was withdrawn. However, some years later the parties again became involved in a dispute and the unions again commenced a secondary boycott against the company, which in 1957 filed a suit for damages alleging breach of the 1951 "settlement agreement." The federal district court granted the union's motion to dismiss. "The contract must be interpreted to ascertain the intention of the parties as to whether the 1951 contract was in effect at the time of the alleged wrongs and damage in the year 1957 in Richmond, Indiana. I conclude that the contract was termi-

nated and the obligations and duties of the parties thereto were fully discharged upon the dismissal of the charges before the National Labor Relations Board.'' (166 F.Supp. at p. 890.) The court went on to cite the *Town of Readsboro* case in illustration of the general principles bearing upon its decision.

California courts have not hesitated to imply a term of duration when the nature of the contract and surrounding circumstances afford a reasonable ground for such implication. Thus, in *Haggerty* v. *Warner, supra,* 115 Cal.App.2d 468, it was held that a contract which provided that plaintiff was to receive ''Five Per Cent (5%) of all our billings'' on certain units, but which contained no express term of duration, was subject to the construction that its obligations were to continue as long as ''billings'' were made by defendants. (115 Cal.App.2d at p. 473; cf. *Warner-Lambert Pharmaceutical Co.* v. *John J. Reynolds, Inc.* (S.D.N.Y. 1959) 178 F.Supp. 655, affd. (2d Cir. 1960) 280 F.2d 197.) See also *Southern Pac. Co.* v. *Spring Valley Water Co.* (1916) 173 Cal. 291 [159 P. 865, L.R.A. 1917E 680].)

While the initial effort of the court, in construing contracts of continuing performance or forbearance which contain no express term of duration, must always be that of implying a term of duration commensurate with the intentions of the parties, in some cases the nature of the contract and the totality of surrounding circumstances give no suggestion as to any ascertainable term. In such cases the law usually[12] implies that the term of duration shall be at least a reasonable time, and that the obligations under the contract shall be terminable at will by any party upon reasonable notice after such a rea-

---

[12]Contracts of employment wherein the only consideration is the services to be performed thereunder and which are silent as to duration, are terminable at will upon reasonable notice *without regard to duration.* (See Lab. Code, § 2922; *Levy* v. *Bellmar Enterprises* (1966) 241 Cal.App. 2d 686, 690 [50 Cal.Rptr. 842]; *Wilson* v. *Red Bluff Daily News* (1965) 237 Cal.App.2d 87, 90 [46 Cal.Rptr. 591]; *Marin* v. *Jacuzzi* (1964) 224 Cal.App.2d 549, 553 [36 Cal.Rptr. 880]; *Mallard* v. *Boring* (1960) 182 Cal.App.2d 390, 394 [6 Cal.Rptr. 171]; 9 Williston on Contracts (3d ed. 1957) § 1017, pp. 126-130; 1 Witkin, Summary of Cal. Law, *supra,* Agency and Employment, § 92, p. 466.) Special policy considerations require this result. '' [T]he courts have not deemed it to be their function, in the absence of contractual, statutory or public policy considerations, to compel a person to accept or retain another in his employ, nor to compel any person against his will to remain in the employ of another. Indeed, they have consistently held that in such a confidential relationship, the privilege [to terminate] is absolute, and the presence of ill will or improper motive will not destroy it.'' (9 Williston on Contracts, *supra,* § 1017, p. 134.)

sonable time has elapsed. (See generally 17A C.J.S., Contracts, §§ 385(1), 398, pp. 457, 480; Am.Jur.2d, Contracts, § 486, pp. 955-957; 1 Williston on Contracts, *supra,* § 38, pp. 112-117.) This rule is generally applicable, for instance, to exclusive sales agency and distributorship contracts.[13] (See *J. C. Millett Co.* v. *Park & Tilford Distillers Corp.* (N.D. Cal. 1954) 123 F.Supp. 484, 492-493; *San Francisco Brewing Corp.* v. *Bowman* (1959) 52 Cal.2d 607, 613-614 [343 P.2d 1]; *Great Western Distillery Products, Inc.* v. *John A. Wathen Distillery Co.* (1937) 10 Cal.2d 442, 447 [74 P.2d 745]; *Connelly* v. *Venus Foods, Inc.* (1959) 174 Cal.App.2d 582, 586 [345 P.2d 117]; *Mangini* v. *Wolfschmidt, Ltd., supra,* 165 Cal.App.2d 192, 202; 9 Williston on Contracts, *supra,* § 1017A, pp. 137-169; see generally Annot., 19 A.L.R.3d 196.) It is also applicable in the labor field to jurisdictional agreements between competing unions (*Green* v. *Obergfell* (D.C. Cir. 1941) 121 F.2d 46 [73 App. D.C. 298], cert. den. 314 U.S. 637 [86 L.Ed. 511, 62 S.Ct. 72]), as well as to agreements between labor and management (*Zimco Restaurants, Inc.* v. *Bartenders etc. Union* (1958) 165 Cal.App.2d 235 [331 P.2d 789]) when the circumstances surrounding said agreements are not such that an ascertainable term of duration may be implied therefrom.

In the *Green* case, for instance, the teamsters union and the brewery workers union, who had been engaged in a dispute relating to jurisdiction over brewery truck drivers for some time in 1915 had concluded an agreement wherein the teamsters union conceded the jurisdiction in question to the brewery workers union. The agreement had no specific term of duration. In 1933 the parties again found themselves in disagreement upon the same question, and the brewery workers union, in the course of subsequent litigation, sought to rely upon the 1915 agreement. The lower court held that the agreement was

[13]Exclusive agency and distributorship contracts are treated differently from simple employment contracts because the former involve consideration in addition to the services to be rendered thereunder. " 'When the obligor has expended a substantial sum of money or value or has substantially rearranged his business . . . preparatory to engaging upon the terms of agreement for the benefit of obligee, he ought, through fairness, to have a reasonable time and notice of the cancellation of the contract in order that he might have a reasonable opportunity to put his house in order.' " (9 Williston on Contracts, *supra,* § 1017A, pp. 150-151, quoting from *Elson & Co.* v. *Beselin & Son* (1928) 116 Neb. 729, 735 [218 N.W. 753]; see also *J. C. Millett Co.* v. *Park & Tilford Distillers Corp.* (N.D. Cal. 1954) 123 F.Supp. 484, 492; *San Francisco Brewing Corp.* v. *Bowman* (1959) 52 Cal.2d 607, 613-614 [343 P.2d 1]; *Connelly* v. *Venus Foods, Inc.* (1959) 174 Cal.App.2d 582, 586-587 [345 P.2d 117].)

valid and binding in 1933, but the circuit court concluded that the agreement was terminable after a reasonable time upon reasonable notice, and that it had been properly terminated by the teamsters. ''Whether or not the agreement was a mere working adjustment without binding contractual character or, on the other hand, had contractually binding effect, it could not have such effect as against the power of the association to make a determination contrary to that reached in the agreement . . . for longer than a reasonable time. . . . Considerations, both of subject matter and of parties, therefore, are persuasive that the contract was not intended to be permanent and that the contract by reason of its inherent nature was terminable. The error of the contrary contention is further demonstrated by the history of technological developments which have produced constant changes in the organization of American industries. The essence of modern industrial economy is its ability quickly to adapt itself to such changes.'' (Fn. omitted.) (121 F.2d at p. 67.)

Other cases in which a contract silent as to duration has been construed, in the absence of circumstances permitting the implication of an ascertainable term of duration, as imposing obligations and duties terminable after a reasonable time upon reasonable notice includes *Freeport Sulphur Co.* v. *Aetna Life Ins. Co.* (5th Cir. 1953) 206 F.2d 5 [41 A.L.R.2d 762], and *Holt* v. *St. Louis Union Trust Co.* (4th Cir. 1931) 52 F.2d 1068.

Turning to the contract before us, whose correlative obligations we have outlined above, we have concluded that the nature of the contract and the circumstances surrounding it permit the implication of an ascertainable term of duration, and that that term had expired prior to the events which gave rise to the instant litigation. We have also concluded that, even if it be considered that the implication of an ascertainable term of duration is not here warranted or possible, the contract had been terminated upon reasonable notice after a reasonable time and was no longer binding at the time of the events here in question.

It is clear that the factual and social context obtaining at the time of the 1931 agreement was vastly different from that obtaining 30 years later. In 1931 the primary function of Local 16 was that of supplying stagehands for live stage performances, and there was at that time a distinct possibility that Consolidated's theatres, the Royal and the Al-

hambra, might at any time have live stage performances on the stages which then existed in those theatres. Today there is no such possibility; those theatres have for many years engaged exclusively in the showing of motion pictures and all facilities for the giving of live performances have been removed therefrom.[14] Furthermore the union, in accordance with the shifting emphasis within the entertainment industry, has shifted its own emphasis from supplying stagehands in the traditional sense to supplying persons engaged in the maintenance of motion picture theatres. In the course of this shift of emphasis the union has formulated policies as to employment demands which, whatever their merit, could not have been anticipated 30 years ago. In view of these circumstances we have decided that it was the intention of the parties contracting in 1931 to create reciprocal obligations binding upon them as long as there existed a real possibility that the theatres owned and operated by Consolidated might undertake to present live stage performances—and no longer. Since that possibility had long ceased to exist at the time of the events leading to the instant litigation, the contract was no longer binding upon the parties at that time.

In short, we conclude that the 1931 contract, although containing no express term of duration, was impliedly conditioned as to duration upon the continued possibility of live stage presentations at Consolidated's theatres, and that the disappearance of that possibility with the passage of time terminated all obligations under the contract.[15]

Moreover, even if it be assumed for the purpose of argument that the nature of the 1931 contract and the circumstances surrounding it are not such as to support the im-

---

[14]Apparently the recent renovation of the Royal Theatre has completely removed the stage which it had in former years.

[15]In reaching this conclusion we have not overlooked the fact that the 1931 agreement included among its general provisions a declaration that the injunction pendente lite obtained by Consolidated in the litigation leading to that agreement should be made permanent. (See fn. 3, *ante*.) Although, as we have indicated, the injunction was not in fact made permanent and Consolidated dismissed its suit, Consolidated here argues that Local 16's concession that the injunction be made permanent manifests an intention that the obligations of the agreement be of perpetual duration. However, this argument wholly ignores the fact that a permanent injunction is ". . . always subject, upon a proper showing, to modification or dissolution by the court which rendered it. . . . This inherent power . . . may be exercised either where there has been a change in the controlling facts upon which the injunction rested, or the law has been changed, modified or extended, or where the ends of justice would be served by modification." (*Sontag Chain Stores Co.* v. *Superior*

plication of an ascertainable term of duration, it is clear that a reasonable time elapsed between the execution of the contract in 1931 and the union's notice in April of 1963 that it no longer considered the contract binding. This notice, which surely was tantamount to a notice of termination, was given seven months prior to any picketing activities, and must be considered reasonable under the circumstances. Under this view, then, the contract was terminated upon reasonable notice prior to the activities of which Consolidated complains.

 Our conclusion, that there was no valid contract between the parties at the time of the labor dispute leading to the instant litigation, precludes application to this case of the so-called contract exception to the rules relating to the jurisdiction of the National Labor Relations Board. We therefore proceed to apply those rules in an effort to determine whether state jurisdiction has been preempted in this case.

We first determine whether the activities here in question are "arguably subject to" those sections of the Act which deal with unfair labor practices affecting commerce and are, therefore, within the jurisdiction of the Board. (See *San Diego Bldg. Trades Council* v. *Garmon, supra,* 359 U.S. 236, 245 [3 L.Ed.2d 775, 783].) [16]

 It is plainly "arguable" that the activities of the union were *protected* by section 7 of the Act,[17] and that the efforts of Consolidated to prevent such activities therefore constituted an unfair labor practice under section 8(a)(1) of

*Court* (1941) 18 Cal.2d 92, 94-95 [113 P.2d 689].) Certainly an agreement to the effect that an injunction be made permanent should not be considered more durable than the contemplated permanent injunction itself.

Neither have we overlooked the fact that Local 16 for more than 30 years refrained from demanding the employment of its members at Consolidated's theatres. The argument that this forbearance manifests continuing regard for the 1931 agreement ignores the fact that Consolidated's actions came in conflict with Local 16's policies only when the Royal sought to establish itself as a first-run theatre, and that demand for compliance was promptly made to the Royal upon its entrance into the category of Local 16's concern.

[16]We here proceed in light of interpretive guidelines set forth by this court in *Grunwald-Marx, Inc.* v. *Los Angeles Joint Board* (1959) 52 Cal.2d 568 at p. 584 [343 P.2d 23]: "[C]ertainly by using the term 'arguably' Mr. Justice Frankfurter [in *Garmon*] did not mean to imply that a litigant can cause a state court to lose jurisdiction merely by the assertion that the particular activity is either protected by section 7 or prohibited by section 8. He must have meant 'susceptible of reasonable argument.' "

[17]Section 7 of the Act provides in relevant part: "Employees shall have the right to self-organization, to form, join, or assist labor organ-

the Act, which provides: "(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." (29 U.S.C.A. § 158(a)(1).) Certainly it can be reasonably argued (see fn. 16, *ante*) that the union's professed objective of creating additional employment opportunities for its members is one of "mutual aid." (Cf. *Bricklayers & Masons Union No. 1* v. *Superior Court* (1963) 216 Cal.App.2d 578, 585-587 [31 Cal.Rptr. 115].) In addition it appears that Consolidated's refusal to submit to the demands of Local 16 had the effect of placing existing jobs in jeopardy (see fn. 5, *ante*), so that the union's contention as to "mutual aid" is given a dual aspect. The fact that the picketing members of Local 16 were not employees of Consolidated does not necessarily deny them the protection of section 7 of the Act (29 U.S.C.A. § 152(3); see *Waxman* v. *Virginia* (1962) 371 U.S. 4 [9 L.Ed.2d 50, 83 S.Ct. 46], revg. 203 Va. 257 [123 S.E.2d 381].)

 We also consider it "arguable" that the activities of the union were *prohibited* by the so-called "featherbedding" provisions found in section 8(b)(6) of the Act: "(b) It shall be an unfair labor practice for a labor organization or its agents— . . . (6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed." (29 U.S.C.A. § 158(b)(6).) Although section 8(b)(6) does not proscribe all attempts on the part of a union to cause an employer to accept unwanted and unneeded services (see *American Newspaper Publishers Assn.* v. *N.L.R.B.* (1953) 345 U.S. 100, 110 [97 L.Ed. 852, 860-861, 73 S.Ct. 552, 31 A.L.R.2d 497]; *N.L.R.B.* v. *Gamble Enterprises* (1953) 345 U.S. 117, 123 [97 L.Ed. 864, 870, 73 S.Ct. 560]), its prohibition does extend to "instances where a labor organization or its agents exact pay from an employer in return for services not performed or not to be performed." (345 U.S. at p. 110 [97 L.Ed. at p. 860].) In the instant case Consolidated produced a substantial volume of evidence which tended to show that maintenance men hired at other theatres under union compulsion did little

izations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . .*" (Italics added.) (29 U.S.C.A. § 157.)

or no actual work but were merely present on the premises during working hours.

Of course, an unfair labor practice is not within the jurisdiction of the Board unless it is one "affecting commerce." (29 U.S.C.A. § 160(a).)[18] However, the parties hereto have not disputed that an effect upon commerce is here involved. Indeed Consolidated, in setting forth its third cause of action alleging violation of the federal Anti-Racketeering Act (18 U.S.C.A. § 1951) (see fn. 6, *ante*), alleged that motion pictures exhibited by it at the Royal had been received "from points within and without the State of California and the exhibition of such pictures at said Royal Theatre constitutes interstate commerce." These circumstances clearly support the claim that the practices here at issue affect commerce and are therefore within the jurisdiction of the Board.

Our determination that the Board has subject-matter jurisdiction in the premises does not, however, as we have pointed out above, result in preemption of state jurisdiction if it appears *either* that the Board has declined to assert its jurisdiction upon application duly made (29 U.S.C.A. § 164(c)(1)) or that the party seeking to invoke state jurisdiction has shown through published regulations and decisions that the Board would decline to assert its jurisdiction if application were made (*Russell* v. *Electrical Workers Local 569, supra,* 64 Cal.2d 22). Since this case involves no prior application to the Board, only the second of these alternatives is here applicable.

Although the Board for many years declined to assert its jurisdiction in cases involving the entertainment industry, it has in recent years asserted jurisdiction in certain kinds of cases within that area. Presumably this heightened concern on the part of the Board is grounded in its realization "that the amusement or entertainment industry, although once regarded as being out of the main stream of commerce, is no longer a negligible factor in our national life." (*Ray, Davidson & Ray* (1961) 131 N.L.R.B. 433, 435.)

Among the cases in the entertainment field to which the Board has directed its attention are some involving motion picture theatres. In the leading case of *Combined Century*

[18]"The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led to or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." (29 U.S.C.A. § 152(7).)

*Theatres, Inc.* (1958) 120 N.L.R.B. 1379, mod. and enforced (2d Cir. 1960) 278 F.2d 306, a complaint alleging unfair labor practices was brought against 13 companies (considered a single employer under the Act by the Board) engaged in the management and operation of 35 neighborhood motion picture theatres on Long Island, New York. It was shown that most of the films exhibited by the respondent companies were made in California, were processed in laboratories outside New York State, and were shown by the companies under license from various New York distributors. It was also shown that during a relevant one-year period the companies paid in excess of two and a quarter million dollars in license fees to such distributors, and that gross box office receipts for a similar period were in excess of seven million dollars. The Board considered that the impact of the dispute upon commerce was "sufficiently substantial to warrant the exercise of its jurisdiction. . . ." (29 U.S.C.A., § 164(c)(1).) "A single neighborhood motion picture theater, like a single neighborhood grocery store, may have only a slight impact upon commerce, but when the single theater, like the single grocery store, is multiplied many times to constitute a chain of theaters or of grocery stores, the impact of the business of the chain upon commerce is no longer slight and the enterprise is no longer essentially local." (120 N.L.R.B. at p. 1383.) It was concluded that motion picture theatres whose operations had an effect upon commerce greater than *de minimis* (see *Lamar Hotel* (1960) 127 N.L.R.B. 885) should be treated as retail enterprises for purposes of applying the Board's discretionary standards relating to the volume of business operations required for assertion of jurisdiction;[19] that the operations of respondent companies satisfied one of these alternative standards, to wit, "indirect inflow" (see fn. 19,

---

[19]Apparently the Board from time to time promulgates standards indicating its view as to the volume of business in which certain classes of employers must engage in order to render disputes to which they are parties of sufficient magnitude to warrant cognizance by the Board. Such standards relate to such things as gross volume; "direct outflow," or volume of goods shipped directly across state lines; "direct inflow," or volume of goods furnished the employer directly from outside the state; and "indirect inflow," or volume of goods furnished the employer from inside the state but which originated outside the state. (See generally Forkosch, Labor Law (2d ed. 1965) § 298, pp. 544-549; *Siemons Mailing Service* (1958) (122 N.L.R.B. 81.) The current jurisdictional standard relating to retail enterprises is gross volume of business of at least $500,000 per annum. (National Labor Relations Board, Jurisdictional Guide, p. 5; see also *Carolina Supplies & Cement Co.* (1958) 122 N.L.R.B. 88.)

*ante*) in excess of two million dollars per annum; and that "it will effectuate the policies of the Act to assert jurisdiction herein." (120 N.L.R.B. at p. 1384.)

Since the *Combined Century Theatres* case the Board has asserted jurisdiction in a number of cases involving motion picture theatres. (See *Philadelphia Moving Picture Machine Operators* (1966) 159 N.L.R.B. 1614, enforced (3d Cir. 1967) 382 F.2d 598; *Skouras Theatres Corporation, etc.* (1965) 155 N.L.R.B. 157, enforced (3d Cir. 1966) 361 F.2d 826; *Motion Picture Operators Union of Essex County* (1960) 126 N.L.R.B. 376.) In each it was determined that the dispute in question had more than a *de minimis* effect upon commerce, thus establishing what the Board calls its "statutory jurisdiction" (see National Labor Relations Board, Jurisdictional Guide, *supra,* pp. 2-4), and that the Board's current jurisdictional limit for retail enterprises, $500,000 per annum gross volume (see fn. 19, *ante*) had been met. In one case (*Chicago Theatrical Protective Union 2, I.A.T.S.E.* (1964) 149 N.L.R.B. 424) it was determined that "statutory jurisdiction" was present but that insufficient allegations had been made to render possible a meaningful determination as to whether the discretionary retail standard had been satisfied. The Board concluded that on the basis of the allegations presented it was "unable to conclude whether or not it will assert jurisdiction herein with respect to labor disputes cognizable under sections 8, 9 and 10 of the Act." (149 N.L.R.B. at p. 426.)

We find ourselves in an analogous situation in the instant case. As we have indicated above, the question of N.L.R.B. preemption was not raised before the trial court. Although, as we have pointed out, the failure to raise this matter below does not preclude our consideration of it here (see fn. 8, *ante,* and accompanying text), that failure has resulted in a trial record ill-designed to permit a meaningful determination of the question which our decision in *Russell* v. *Electrical Workers Local 569, supra,* requires that we answer, to wit, has Consolidated shown through published regulations and decisions that the Board would decline jurisdiction in this case if application were made to it? In the circumstances we are reluctant to insist that Consolidated bear this burden on the basis of the record in this case, and we have determined that the cause must be remanded to the trial court for a full hearing on the jurisdictional question.

If upon remand Consolidated does not bear its burden of showing that the Board would decline to assert jurisdiction in the cause, the action should be dismissed. If the indicated burden is borne by Consolidated, the trial court may proceed to assert its own jurisdiction in the premises. However, in view of our conclusion that the 1931 agreement—which we conceive to be the basis of all three counts in the original complaint—was of no force and effect at the time of the 1962-1963 dispute, the court should allow Consolidated a reasonable opportunity to amend its complaint so as to state any further causes of action in the premises. We, of course, intimate no opinion as to the nature or merit of such possible causes of action.

The judgment is reversed and the cause is remanded to the trial court for further proceedings in conformity with the views herein expressed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Peek, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.