Filed 6/11/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| RMR EQUIPMENT RENTAL, INC., | B302772 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. PC056872) |
| v. | |
| RESIDENTIAL FUND 1347, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen P. Pfahler, Judge.  Reversed in part and remanded.

Fluetsch & Fluetsch and Michael Fluetsch for Plaintiff and Appellant.

Jonathan T. Trevillyan for Defendants and Respondents.

————————————

Water was a problem at the Paradise Ranch Mobile Home Park. This privately owned rural park relied entirely on wells because the nearest public water system was miles away. But then something Californians dread came to pass: water demand overtook supply.

The park, now owned by Residential Fund 1347, LLC and related entities, contracted with RMR Equipment Rental, Inc., doing business as RMR Water Trucks, which owns water trucks. The contract was for RMR to supply the park with drinking water beyond what the wells could produce. The contract was long-term; the parties struck the deal in 2002 and continued it until 2015.

The trial court found the park breached the contract in 2015 but limited RMR's damages to three months, reasoning the contract was terminable at will. The contract was not terminable at will. It was a requirements contract with a termination clause. We remand for a damages award from the date of breach to the date of trial, as RMR requested, which is about four years.

I

This contract case has two sides: seller and buyer. The seller was RMR. The buyer was the park, which has changed ownership, but ownership is not an issue here. We call the buyer "the park."

The park is nestled in the Sierra Pelona mountains, 50 miles from downtown Los Angeles and north of the town of Castaic. This park has never been connected to a water district or to some other large water system.

Three significant years are 2002, 2010, and 2015. In 2002, buyer and seller signed their contract and began their long-term commercial relationship. In 2010, the park changed ownership.

2

In 2015, the park breached the contract and ended the relationship.

The trial record contains no disputes important to the appellate issue. We summarize this record.

A

In 2002, the park's peak demand for water began to outstrip its wells' production. Compounding declining supply were contamination issues and changing quality standards, which together meant some well water no longer counted as potable. The park hired companies different from RMR to truck in water—not every day, but as needed. The uncontested evidence is "there are plenty of licensed water haulers that are in the region that are capable of servicing the park."

The park, however, was not pleased with these occasional truck deliveries. Some truckers were unlicensed. They also were unreliable in summer. Summer is the busy season for water trucks. "Everybody that needs water needs more water in the summer." Summer brings heat. It brings wildfires, and fire camps need potable water from trucks.

The park could not get the priority treatment it wanted from the occasional truckers. Instead of reliably serving the park, they would "take the work that pays more." They exploited demand peaks by charging the park high prices.

These problems were not transient. The park did not expect to get "public water delivered by pipeline for quite some years."

The park sought to solve its long-term problems with a long-term contract and a long-term contractor. In 2002, Pacific Housing Management, the company then managing the park,

3

approached Donald Gilmour, who founded RMR with his father. Gilmour was and is RMR's sole owner.

Gilmour testified at trial.

The deal started in a diner.

Gilmour was eating at Mike's Diner in Castaic. Lashonne Fiala was working there and heard Gilmour say something about water trucks. Fiala knew the park's water problems: she lived in the park and her father Frank Fiala was the park's resident manager.

Frank Fiala managed the park from 1996 to 2010. Fiala oversaw day-to-day operation and maintenance and ran the water and sewer systems. His off-site supervisor was Ernie Hommerding. At trial Fiala testified by deposition: he had retired to Florida and was too ill to get to trial in person. Hommerding did not testify; he passed away in 2009, before this lawsuit began.

Lashonne Fiala at the diner heard Gilmour talking about water trucks and told him about the water trouble at the park. She got Gilmour's number and gave it to her father.

Frank Fiala set up a meeting with Gilmour and Hommerding. Hommerding and Fiala negotiated for the park. Gilmour negotiated for RMR.

Their negotiations were successful. Fiala, Hommerding, and Gilmour struck the deal at the heart of this case.

The two surviving witnesses, Fiala and Gilmour, testified about this contract's formation. Their testimony was consistent on every substantial point. On the contract's origin and meaning, there has been no challenge to the credibility or to the consistency of this testimony, either in the trial court or on appeal.

4

The negotiations began in the park's clubhouse.

In October 2002, Fiala and Hommerding met Gilmour in the clubhouse. Hommerding said the park lacked a reliable water supply and faced fluctuating water prices. Gilmour said his company RMR could solve those problems. Gilmour was willing to make the park RMR's primary potable water customer. He was willing to do that at a fixed and predictable price agreeable to all.

The three discussed the park's need for complete reliability. Fiala and Hommerding wanted total certainty about the water. When they needed water and called RMR, they wanted assurance "we would get our water" and the park would not have to compete with other buyers.

Gilmour agreed on that score: "the park would never do without water; and that was year-round, 365, even weekends. If [the park] needed water, [Gilmour] had to produce it. A locked-in, fixed price indefinitely that [Gilmour] had to deal with."

This guarantee meant Gilmour would have to turn down other customers "to the extent that Paradise Ranch had to be serviced first."

Gilmour eventually found a set price acceptable to all.

The fixed nature of this price was important to the park because of its bad experience with price gouging.

By agreeing to a fixed price with no escalation formula, Gilmour knew he was taking risks. If RMR's wage, gasoline, or insurance costs later rose, the contract did not allow RMR to adjust the fixed price. Later, in fact, RMR's costs did go up "dramatically," but RMR never reneged; it honored the fixed price and always got the park its water on time.

Gilmour did not name the price in the first meeting. Before choosing a price, Gilmour personally drove the route to get mileages. He did some other calculations. Then he proposed $110 per 3,200-gallon truckload. The park agreed. So $110 was the locked-in price.

In return for granting priority status and committing to the locked-in price, Gilmour wanted a contract making RMR the exclusive water hauler for the park. Gilmour "was giving [the park] a lot, and [he] wanted something in return to know that [he] was going to have the ability to recoup [his] investment."

Gilmour demanded the park's guarantee he would be its only water trucker. The three at the meeting agreed on that point: finding another company willing to truck in the water would *not* be considered "another source of water" under the contract. They also "specifically discussed and agreed that[,] if the [p]ark purchased its own water truck to truck in potable water, that would not be a legitimate ground to terminate RMR's contract."

The deal would bar the park from purchasing and using its own water truck. The park and RMR agreed the park would not "hire or use" anyone but RMR "as long as [RMR] provided us with the water on a timely basis as needed at the current rate."

The parties decided to base contract duration on performance and contingencies, not on the calendar; they set no expiration date. Rather, the contract would end when the park no longer needed trucked water, either because it put in enough new wells or because it succeeded in connecting to a public water system.

After the clubhouse meeting, Hommerding drafted a one-page contract on Pacific's letterhead. This agreement is concise:

just three paragraphs.  We quote the whole thing, italicizing two key sentences:

"**Service Contract**

"It is agreed that RMR Water Trucks will provide a potable water truck that is state of California certified for Paradise Ranch Mobilehome Park for the purpose of delivering potable water.  *RMR agrees to make Paradise Ranch its primary potable delivery account.*  It is further agreed that RMR Water Trucks will provide $1,000,000.00 liability insurance, vehicle insurance and workman compensation insurance to Paradise Ranch upon acceptance of this contract.

"*RMR Water Trucks will be guaranteed water delivery to Paradise Ranch as long as the park needs water to supplement its well water production or another supply of water becomes available.*  The cost of delivery (3200 gal) shall be $110.00 per load.

"By signing below, all parties agree to all of the above statements."

The writing did not define the phrase "another supply of water."

Hommerding and Gilmour signed the contract in late 2002.

What happened next stemmed from Gilmour's contractual promise to "provide a potable water truck that is state of California certified for Paradise Ranch Mobilehome Park for the purpose of delivering potable water."  Gilmour bought a truck chassis and paid a company to weld together a custom potable water truck to his specifications.  Since then, Gilmour has added more potable water trucks to his fleet using the same approach: he has them custom built to his specifications, using technology he keeps secret.

In 2002, Gilmour started delivering a load to the park two or three days a week. Over time the park demanded more water. At times Gilmour had to deliver seven days a week, with as many as eight loads a day. The park's increasing demand prompted Gilmour to build more trucks.

## B

In 2010, the park changed owners. Bo Zarnegin became sole owner. Zarnegin has purchased dozens of real estate properties "all over the country." Zarnegin transferred the formal ownership of the park from one corporate entity to another. Zarnegin was sole owner of these entities.

After the sale, Gilmour met with the park's new manager Chuck Lippincott. Lippincott said the new owner would assume the contract. A few months later, a new management company took over and new people began managing the park. Zarnegin testified he saw RMR's contract in 2011. The park kept calling RMR when it needed water, and RMR kept delivering at the contract price. That continued for years—until 2015, anyway.

## C

In 2015, the park began hauling water in a truck it bought. Gilmour confronted park managers, saying this violated the contract. The park offered to use RMR on an as-needed basis instead of as the park's exclusive trucker, but wanted to keep the price at $110 per load. Gilmour rejected this offer, saying this proposal gave all the benefit to the park and none to RMR. The park stopped asking RMR for water. Gilmour went to court.

## D

In February 2016, RMR sued three defendants for breach of contract: Pacific Housing Management, Residential Fund 1347, LLC, and Residential Fund Manager 1347, LLC. During the

lawsuit, Zarnegin transferred ownership of the park to another entity for $1. On RMR's motion, the court added new defendants: "Paradise Ranch, LLC dba Paradise Ranch dba Paradise Ranch Mobile Home Park," as well as Zarnegin himself. We refer to all defendants as the park.

At a bench trial, Zarnegin testified it was still necessary to truck water to the park.

After the trial, the court took briefing in lieu of oral argument. Later it filed a four-page statement of decision. The court orally praised the parties' cooperation during trial and remarked in writing generally on "the credibility of the witnesses."

The statement of decision found no facts. It neither noted nor resolved factual conflicts. Instead, the trial court decided the case on legal conclusions it drew from an undisputed factual record.

The trial court concluded RMR had entered a valid written contract with Pacific Housing Management in 2002 to supply water to its mobile home park. It further ruled, with our emphasis, that "[i]n 2010, when the subject mobile home park was sold, [RMR] continued to deliver water to the new owners [Residential Fund 1347] under *the same terms* and conditions as the original contract." Again with our emphasis, the court wrote that Residential Fund 1347 "assumed and ratified the *terms* of the contract." The court observed Zarnegin was aware RMR was delivering the water to the park and never objected to the service. The court ruled defendants breached their agreement in July 2015 when they stopped the water delivery service, and that RMR "established its causes of action for breach of contract."

9

There was a dispute about the right way to calculate damages. RMR asked for an award from the date of breach to the date of trial—a span of about four years. With interest, this request totaled $518,079. The court rejected this request. It ruled the contract contained no express duration term and thus was terminable at will on reasonable notice, which the court determined was three months.

The court awarded RMR $26,250 as damages for these three months because this sum was "fair and equitable." The court did not explain the factual or legal basis for its selection of three months as the "fair and equitable" damages interval. The park, in its briefing to us, recites this ruling but makes no effort to connect the selection of three months to the factual record or to any argument or logic of counsel. The three-month limitation seems to have originated in the statement of decision, where it is unexplained.

RMR appealed the court's decision to award damages for three months rather than for the duration RMR requested, which was about four years. The park did not appeal.

## II

The trial court found the park's new owners ratified the 2002 contract with RMR and then breached it. The park has not appealed this ruling; it is unchallenged. It binds us. The only appeal is by RMR, and RMR's sole complaint is the trial court erred by awarding damages for three months only.

RMR is right. This requirements contract was not terminable at will. It had an express termination clause that we must respect. (*Zee Medical Distributor Assn., Inc. v. Zee Medical, Inc.* (2000) 80 Cal.App.4th 1, 7–14 & fns. 3 & 6 (*Zee*).)

10

A

Our mission in every contract case is to discern and effectuate the contracting parties' mutual intent. We begin with the words of the contract. The nature of the contract and the surrounding circumstances can inform those words. (See *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union, Local 16* (1968) 69 Cal.2d 713, 725–731 (*Consolidated*).)

We gain insight by divining the purpose of the contract. Understanding what the parties were trying to accomplish can illuminate their contractual language. (*Regency Midland Construction, Inc. v. Legendary Structures Inc.* (2019) 41 Cal.App.5th 994, 998–999 (*Regency*); Rest.2d Contracts, § 202, subd. 1 & com. c, pp. 86 & 88.)

Generally speaking, contract interpretation is a legal rather than a factual question. (*Empire Gas Corp. v. American Bakeries Co.* (7th Cir. 1988) 840 F.2d 1333, 1337 (*Empire*) (Posner, J.).) It is a judicial function to interpret a written contract, unless the interpretation turns upon the credibility of extrinsic evidence. (*Consolidated, supra*, 69 Cal.2d. at p. 724.)

A trial court properly admits evidence extrinsic to the written instrument to determine the circumstances under which the parties contracted and the purpose of the contract. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 864–865 (Traynor, J.) (*Parsons*).)

When witnesses give conflicting factual accounts and the fact finder makes credibility assessments to resolve these conflicts, we defer to the fact finder's determinations. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–583; *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 1150, 1155.)

11

When, as here, no extrinsic evidence is in conflict, we undertake our own construction of the agreement as regards its duration.  (*Consolidated*, *supra*, 69 Cal.2d. at p. 724.)  When the material extrinsic evidence is undisputed, reviewing courts independently determine the meaning of the contract.  (*Parsons*, *supra*, 62 Cal.2d at p. 866; cf. *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604 [when there is no conflict or question of credibility in the relevant extrinsic evidence, interpretation of a written trust is a question of law for independent appellate review].)

B

The controlling authority, according to the parties, is the *Consolidated* decision, in which the California Supreme Court set out a three-step analysis for determining a contract's term of duration.  First, courts look for an express duration provision in the contract.  If one exists, we enforce it according to its terms.  Second, if the contract does not have an express provision, we look to the intention of the parties to imply a duration.  Third, if we find neither an express nor an implied term, we construe the term of duration to be a reasonable time.  (*Consolidated*, *supra*, 69 Cal.2d at pp. 723–731.)

The proper analysis here begins and ends at step one.  (See *Zee*, *supra*, 80 Cal.App.4th at p. 10.)

This contract has an express duration provision:  "RMR Water Trucks will be guaranteed water delivery to Paradise Ranch *as long as the park needs water to supplement its well water production or another supply of water becomes available.*"  The italics are ours.

RMR had an exclusive deal the park could not circumvent by buying and using its own water truck.  The trial court found

12

the park breached the contract and the park has not appealed this ruling. We consequently confront no dispute over ratification; that was decided and was not appealed. Our sole issue is contract duration.

This contract was not terminable at will. It was to continue as long as the park needed water to supplement its well production: until it obtained another supply of water by connecting to some larger water system or by drilling more wells that obviated the need for trucks. Therefore it was error to limit damages for breach to an arbitrary three-month term. The court should have awarded damages for roughly four years, as RMR requested. (We do not consider the issue of interest, which is for the trial court on remand.)

C

The park argues we should interpret the contract to allow it to truck its own water in competition with RMR. Under the park's proposed interpretation, the contract allowed it to buy and use its own truck.

The park's argument goes like this. The contract uses the words "another supply of water." Water hauled in the park's own truck literally is "another supply of water." The park concludes the contract left it free at all times to use its own water truck. The logical implication is the contract also left the park free to use all other non-RMR trucks as well, for they too would be "another source of water." This proposed interpretation thus would effectively make the contract terminable at will: a one-sale arrangement the parties could extend load by load.

The park's interpretation is untenable for two reasons. First, it violates the contract's language and purpose. Second, it is contrary to undisputed extrinsic evidence. We explain.

13

First, the park's proposed interpretation violates the language and the purpose of this contract.

The key contract sentence, with our emphasis, is this: "RMR Water Trucks will be *guaranteed* water delivery to Paradise Ranch as long as the park *needs* water to supplement its well water production or *another supply of water* becomes available." This sentence has six crucial words: the park's "*guarantee*" that RMR would serve the park's "*needs*" until "*another source of water*" became available.

The park says non-RMR water trucks are "another source of water" and so the contract allows it to haul water in its own truck. RMR disagrees, saying "another source of water" refers to the prospect the park someday may connect a pipe to a public water system, which would do away with the need for trucks. RMR thus contends the sentence designates RMR as the park's exclusive water trucker. (Under both proposed interpretations, the author of this language apparently omitted the word "until" before the word "another." The parties make nothing of this omission. We ascribe no significance to it.)

This sentence poses a classical problem of textual interpretation. For two different textual reasons, we reject the park's proposed interpretation.

a

By ignoring the word "guaranteed," the park offers an interpretation that is fatally incomplete and thus unsatisfactory.

The park's proposed interpretation of *four* words is literal. Water from a non-RMR truck literally is "another source of water." Yet the park's proposal ignores a *fifth* word:

"guaranteed."  The park's brief never attempts to explain how this word can be consistent with its proposed interpretation.

The word "guaranteed" is textual support for RMR's interpretation.  If the park were to be free at any time to shift to RMR's competitors, then the word "guaranteed" becomes meaningless.  This construction of the contract would guarantee RMR nothing.  It drains the exclusive contract of all exclusivity.

Felix Frankfurter reputedly said the three rules of statutory interpretation are to read the statute, read the statute, and read the statute.  The same wise counsel applies to interpreting every text.  (*Regency*, *supra*, 41 Cal.App.5th at p. 996.)  It is a cardinal interpretative sin to ignore words you are trying to interpret.  This sin dooms the park's argument about the proper way to interpret the text of this contract.

Beyond this bar, the park's proposed interpretation faces a further barrier.

b

The park's proposed interpretation contradicts the commercial purpose of this requirements contract.

Determining a *literal* meaning is the first, not the final, step in textual interpretation.  Literary scholar Terry Eagleton gave us his celebrated example of this escalator sign:  "Dogs must be carried on the escalator."  (Eagleton, Literary Theory: An Introduction (2008) p. 6.)  The literal reading is that, if you take the escalator, you must carry a dog.  This literal reading qualifies as what Judge Posner calls a "semantically permissible reading" of the words.  (*Empire*, *supra*, 840 F.2d at p. 1336.)

Yet this literal and semantically permissible reading is comically incorrect.  It is woodenly insensitive to the purpose of

15

the sign, which is to advance safety, not to prompt people to get dogs.

How do we know that? We share background knowledge about context. Readers of the sign all know something about escalators, their hazards, and public safety.

In other words, we know the nature of the sign and the surrounding circumstances.

For that reason, the Supreme Court directs us, when interpreting a contract, to examine its nature and the surrounding circumstances. (*Consolidated*, *supra*, 69 Cal.2d at p. 725.)

The nature of this contract is familiar in commercial practice and commercial law: it is a *requirements* contract. This is the reasonable interpretation of the words "guaranteed," which the park's proposed interpretation would impermissibly erase. The word "needs" also alerts the attentive reader this is a requirements contract, as we shall demonstrate shortly. Until the park established an alternative to trucked water, then, the contract gave RMR the exclusive right to fulfill the park's *requirements* for trucked water.

RMR correctly argues the contract was for it to provide all the trucked water the park needed. RMR did not use the words "requirements contract" but that is semantics, not substance. On substance, RMR's position has been consistent and correct since 2015.

Requirements contracts are not novel. They are old in commerce and old in the law of commerce. (E.g., *Wells v. Alexandre* (1891) 130 N.Y. 642, 642 [29 N.E. 142, 142] [requirements contract for "all coal necessary for the use of certain steamships"]; cf. *McMichael v. Price* (1936) 177 Okla. 186,

16

186–190 [58 P.2d 549, 550–553] [requirements contract to furnish all sand a salesman could sell] [collecting numerous decisions dated 1895, 1902, 1909, 1911, and so forth].)

"In a requirements contract, the buyer agrees to purchase and the seller agrees to sell all or up to a stated amount of what the buyer _needs_ or *requires*. There is implicit consideration in a requirements contract, for the buyer gives up the right to buy from any other seller, and this forfeited right creates a legal detriment. Requirements contracts are common in the business world . . . ." (Miller & Jentz, Business Law Today (4th ed. 1997) p. 348, bolding deleted, underlining added, italics in original; see also *id*. at p. 349 ["The obligation of good faith is particularly important in requirements and output contracts. Without the obligation of good faith, the potential for abuse would be tremendous."]; see also Smith & Robertson, Business Law (13th ed. 2006) pp. 175, 210.)

When the parties phrase their contract in terms of what the buyer requires or *needs*, we recognize they have made a requirements contract.

Corbin explains: "In a requirements contract the quantity term is not fixed at the time of contracting. The parties agree that the quantity will be *the buyer's needs* or requirements of a specific commodity or service. Requirements contracts serve a vital commercial need. The buyer gets the assurance of a source of supply. The supplier locks in a customer, knowing, however, that the customer's needs are variable and uncertain." (2 Corbin on Contracts (Rev. ed. 1995) § 6.5, italics added.)

The parties do not cite the Uniform Commercial Code or contend it applies to this case, but we note its section 2-306(1) validates requirements contracts. California has adopted the

17

UCC, including this provision, which is titled "Output, requirements and exclusive dealings." California law recognizes the enforceability of requirements contracts. (See Cal. U. Com. Code, § 2306, subd. (1).)

"If there were no legal category of 'requirements' contracts and no provision of the Uniform Commercial Code governing such contracts," (*Empire*, *supra*, 840 F.2d at p. 1336) the park's proposed literal interpretation might have some appeal—assuming we are free to ignore the words "guaranteed" and "needs," which we are not. Yet those words, together with the nature of this arrangement, have "sorted the contract into the legal bin labeled 'requirements contract' " (*ibid.*) and the logic attending this sorting is plain.

Cardozo tells us why. His revered decision in *Wood v. Lucy, Lady Duff-Gordon* (1917) 222 N.Y. 88 [118 N.E. 214] (*Duff-Gordon*) is a staple of contracts casebooks. It is in the "pantheon of contracts cases." (Rakoff, *Good Faith in Contract Performance:* Market Street Associates Ltd. Partnership v. Frey (2007) 120 Harv. L.Rev. 1187, 1187; see also *id.* at p. 1195 & fn. 36; Posner, Cardozo: A Study in Reputation (1990) pp. 92–97 [explaining opinion's greatness] (Posner).)

Cardozo set the law on its modern path by reading a cryptic exclusivity agreement—a type of requirements contract—with sensitivity to its commercial purpose.

In *Duff-Gordon*, Cardozo recounted how Lucy, Lady Duff-Gordon gave one Otis Wood the exclusive right to market her fashion clothing line. Duff-Gordon would get one-half Wood's profits. But then Duff-Gordon began selling her line through another retailer without Wood's knowledge. Wood sued for contract breach; Duff-Gordon demurred, saying the deal was

18

unenforceable because it lacked consideration:  the contract did not require Wood to *do* anything.  (*Duff-Gordon, supra,* 118 N.E. at p. 214.)

Cardozo responded:  "It is true that [Wood] does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs.  We think, however, that such a promise is fairly to be implied. . . . We are not to suppose that one party was to be placed at the mercy of the other. . . .  Without an implied promise, the transaction cannot have such *business efficacy*, as both parties must have intended that at all events it should have."  (*Duff-Gordon, supra,* 118 N.E. at pp. 214–215, quotation marks and citation omitted, italics added.)

Cardozo thus ruled the contract was enforceable.  It implicitly required Woods to use his best efforts to promote Duff-Gordon's line.

As have most states, California has accepted Cardozo's pioneering analysis.  (E.g., *Davis v. Jacoby* (1934) 1 Cal.2d 370, 379 [citing case with approval].)

By focusing on "*business efficacy*," Cardozo ascribed economic rationality to the contracting parties.

Courts have long recognized the business efficacy of requirements contracts.  Requirement contracts can assure supply, afford protection against price increases, enable long-term planning on the basis of known costs, and eliminate the expense and risk of storage.  From the seller's standpoint, requirements contracts may substantially reduce selling costs, protect against price fluctuations, and offer the prospect of a predictable market.  (*Standard Oil Co. of California v. United*

19

*States* (1949) 337 U.S. 293, 306–307; see also *Tampa Electric Co. v. Nashville Coal Co.* (1961) 365 U.S. 320, 334.)

There was a time courts badly misunderstood requirements contracts and exclusive dealing. Scholars took on and exposed these errors. (See, e.g., Bork, The Antitrust Paradox (1978) pp. 299–309 (Bork); Ramseyer & Rasmusen, *Exclusive Dealing: Before, Bork, and Beyond* (2014) J.L. & Econ. S145, S147–S151 (Ramseyer & Rasmusen).)

Professor and later United States Circuit Judge Robert Bork wrote that, "[q]uite obviously, exclusive dealing and requirements contracts are forms of vertical integration." (Bork, *supra*, at p. 299.) Economically sophisticated legal scholars working in Bork's wake have explained these kinds of contracts offer the parties many other potential advantages as well. (E.g., Klein, *Exclusive Dealing as Competition for Distribution "On the Merits"* (2003) 12 Geo. Mason L.Rev. 119, 137–162; Ramseyer & Rasmusen, *supra*, at pp. S149–S151.)

The purpose of the requirements contract in this case thus was to reap the mutual advantages of a predictable and enforceable long-term relationship, as is plain from the face of the deal. (Cf. Posner, *supra*, at p. 96 ["The best-efforts obligation in exclusive-dealing arrangements, pioneered in *Wood v. Duff-Gordon*, promotes the achievement of the basic goal of contract law, which is to facilitate the making of long-term commitments."].)

Under this requirements contract, the park got reliable water service, come drought or flood, at a stable price it thought was fair. RMR got a long-term customer that promised significantly assured business. The long-term arrangement reduced risk for the park and allowed RMR to invest in costly

custom trucks with some confidence it could recoup the expense. The requirements contract with the park gave RMR the confidence to make long-term investments. All benefitted.

Converting this long-term arrangement to an at-will or spot contract, as the park urges and as the trial court did, would frustrate this common and beneficial commercial goal. If the park were free unilaterally to renege on its promise to make RMR its sole trucking supplier, RMR would have had no reason to forego its ability to jack up the price opportunistically and to delay or divert deliveries when demand was high. As Cardozo put it, "[w]e are not to suppose that one party was to be placed at the mercy of the other." (*Duff-Gordon, supra*, 118 N.E. at p. 214.)

In short, the park's proposed interpretation would defeat the routine and attractive commercial purpose that motivated the parties to strike this deal. For this reason alone, we would reject the park's effort to interpret the words "another supply of water" to include water from non-RMR trucks.

2

The second reason is extrinsic evidence. The extrinsic evidence is consistent. It consistently contradicts the park's proposed interpretation.

The extrinsic evidence here is unusually clear and powerful. Fiala and Gilmour were the only surviving people who negotiated and agreed to the contract. They were opposing negotiators: Fiala was the buyer; Gilmour was the seller. Often opposing sides oppose each other. Yet here they spoke with one voice. At trial and on appeal, the park has not questioned the credibility or consistency of this evidence from Fiala and Gilmour.

Fiala and Gilmour were the only witnesses with personal knowledge of the contract's negotiation history.

Zarnegin opined about the contractual language, but he lacked personal knowledge of the contract's origin. As extrinsic evidence about the contract's creation and meaning, Zarnegin's testimony had nothing to offer.

When a trial court makes no finding on a factual issue, a reviewing court will not assume the trial court would have made a finding *contrary* to the uncontroverted evidence and the reasonable inferences it creates. That would be illogical. Rather, the reviewing court will assume that, had the finding been made, it would have accorded with this evidence. (*Walpole v. Prefab Manufacturing Co.* (1951) 103 Cal.App.2d 472, 481.)

The uncontroverted extrinsic evidence of the parties' intent in 2002 governs the park's ratification of the contract in 2010. The new owners ratified the old contract; they did not renegotiate or reform its terms. Recall the trial court found (with our emphasis) "that RF 1347 assumed and ratified the *terms* of the contract." (Italics added.) The park has not appealed this ruling, which binds us.

Ratification does not alter the terms of a contract or make a contract with different terms. (*City of Brentwood v. Dept. of Fin.* (2020) 54 Cal.App.5th 418, 437.) An act of ratification adopts the contract as it was originally made. (*Id.* at p. 438.)

The park says something is amiss in the prospect this contract could last a century or two. But the park handcrafted this document as a customized agreement between two businesses of presumably equal bargaining power. The park wrote this deal on its own manager's letterhead; RMR was not the drafting party. This long-term agreement evidently made

good sense to the people who forged it.  The park apparently planned to continue indefinitely; the record tells us nothing to the contrary.  As long as people are living there, they will need water.  For RMR's part, it seemed eager to serve a significant customer for as long as possible.  And everyone signing a long-term deal knows they always can renegotiate—if both sides agree to the new terms.

D

The textual analysis and the analysis of extrinsic evidence mesh perfectly.  This is a clear case:  all signs point the same way.

**DISPOSITION**

It was error to limit damages to a three-month interval.  RMR requested damages be calculated from breach to the date of trial, which was about four years.  We remand for a calculation of an award based on this interval.  We award costs to the plaintiff and appellant.

WILEY, J.

I concur:

GRIMES, J.

## BIGELOW, P. J.

I concur in the judgment.

This is a simple contract dispute with a simple resolution. The problem emanates from a single page contract about the transportation of potable water to a mobile home park. It was resolved after a 12-hour bench trial. Seven witnesses testified. Three discussed the contract's original formation by the prior owners of the mobile home park in 2002. Four testified about the subsequent agreement by the new owners in 2010. A solitary issue is presented in the appeal—how long was the contract in effect? Both parties agree the matter can be resolved by application of longstanding California Supreme Court precedent found in *Consolidated Theaters, Inc., v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713 (*Consolidated*), which guides this state's courts in determining the duration of a contract.

I agree the trial court incorrectly found the contract had no express termination clause, so we must reverse and remand for a recalculation of damages. I write separately because I would decide this case on the issues as raised by the appellate briefs and the trial court's ruling.

Appellant RMR Equipment (RMR) filed a complaint for breach of written and oral contract against Pacific Housing Management, respondent Residential Fund 1347 LLC (RF 1347), and Residential Fund Manager 1347 LLC. When RMR discovered that Bo Zarnegin, the sole member of RF 1347, transferred all the LLC's assets to a new entity called Paradise Ranch LLC, the court allowed RMR to add Paradise Ranch LLC and Zarnegin as Doe defendants. RF 1347 cross-complained

1

against Pacific Housing Management and Residential Fund Manager.

The trial court found it undisputed that RMR entered into a written agreement with Pacific Housing Management in 2002 to supply water to its mobile home park. The one-page contract stated in full:

"It is agreed that RMR Water Trucks will provide a potable water truck that is state of California certified for Paradise Ranch Mobilehome Park for the purpose of delivering potable water. RMR agrees to make Paradise Ranch its primary potable delivery account. It is further agreed that RMR Water Trucks will provide $1,000,000.00 liability insurance, vehicle insurance and workman's compensation Insurance to Paradise Ranch upon acceptance of this contract.

"RMR Water Trucks will be guaranteed water delivery to Paradise Ranch as long as the park needs water to supplement its well water production or another supply of water becomes available. The cost of delivery (3200 gal) shall be $110.00 per load.

"By signing below, all parties agree to all of the above statements."

The court found that "[i]n 2010, when the subject mobile home park was sold, [RMR] continued to deliver water to the new owners [RF 1347] under the same terms and conditions as the original contract." The court found "that RF 1347 assumed and ratified the terms of the contract . . . ." It found that Zarnegin was aware RMR was delivering the water to defendants and that defendants never objected to the service. The court found defendants breached their agreement in July 2015 when they stopped the water delivery service, and RMR "established its

2

causes of action for breach of contract." The court, however, did not "find that the contract was properly assigned."

The trial court found the contract had "neither an express nor implied term" regarding termination of the contract. Citing *Zee Medical Distributor Assn. Inc. v. Zee Medical Inc.* (2000) 80 Cal.App.4th 1, 10 (*Zee Medical*), the court thus found defendants "had the right to terminate the contract within a reasonable period of time." The court ruled that three months was a reasonable time to give notice of termination of RMR's services, and awarded $26,250 against all defendants except Zarnegin, jointly and severally. On the cross complaint, the court awarded $10,000 in favor of RF 1347 and against Pacific Housing Management.

RMR alone appealed; it claims the trial court improperly limited its damages as it erred in finding RF 1347 had the right to terminate the contract after a reasonable time.

As noted, both parties agree the controlling authority on this issue is *Consolidated*. In *Consolidated*, the California Supreme Court set out a three-step analysis for determining a contract's term of duration. First, courts look to find an express term of duration in the contract. If one exists, it should be enforced according to the contract terms. Second, if the contract does not have an express term, the court looks to the intention of the parties to imply duration. Third, if neither an express nor an implied term can be found, the term of duration is construed to be a reasonable time.

RF 1347 devotes much of its respondent's brief to arguing there was no express term of duration because there was never a written or oral contract between it and RMR. RMR responds that the trial court explicitly found RF 1347 ratified and assumed the

3

prior written contract with Pacific Housing Management, and the trial court's finding is supported by substantial evidence. RF 1347 declined to appeal the judgment, and that ends the matter.

Because RF 1347 was found to have assumed and ratified the written contract, the next question that arises is whether the trial court properly found the contract lacked an express or implied term of duration. (See *Consolidated, supra*, 69 Cal.2d at p. 725.)

Contrary to the trial court's ruling, the contract has an express termination clause. It states that RMR is guaranteed water delivery "so long as the park needs water to supplement its well water production or another supply of water becomes available." There is no problem with a contract terminating upon an event, rather than a date. "California cases have long recognized that a contract may, by its express terms, provide for a term of duration of indefinite length and without specific limitation, tied not to the calendar but to the conduct of the contracting parties." (*Zee Medical*, *supra*, 80 Cal.App.4th at p. 7.)

The problem is that the parties disagree on what is meant by the phrase "*another supply of water becomes available.*" This issue was hotly contested at trial. RMR contends these words mean the contract continues until the mobile home park is connected to a public water system, or the park's onsite wells produce enough water to satisfy the residents' water needs. RF 1347 argues that bringing in potable water by its own truck is another source of water that properly terminated the contract.

The issue is readily resolved by reference to the trial court's finding that RF 1347 breached the contract. Though the trial court incorrectly found there was no termination clause, its finding that RF 1347 breached the contract required an implied

4

finding the contract was not properly terminated upon RF 1347 trucking in its own potable water. In other words, the trial court necessarily concluded the termination clause would be triggered and the contract would end only if RF 1347 stopped RMR water deliveries because it had enough onsite well water or the park was connected to a public water system.

This leads to the simple resolution of this case. Again, RF 1347 did not appeal, meaning we must accept the court's finding that the contract was breached. The only remaining question is whether the term that was breached qualified as an express termination clause. It did, contrary to the trial court's finding. RMR's damages thus were not limited to a reasonable time, and the trial court erred by finding otherwise. This case must be remanded for a recalculation of damages. Our analysis should end there.

I would resolve this matter without using this case as a platform to discuss requirements contracts and without providing a lengthy exposition on the topic, especially given the contract was never referred to as anything other than a service contract and the issue was never briefed in the trial court or on appeal.

I would not make the monumental decision that extrinsic evidence of conversations between RMR and the prior park owner in 2002 are binding on the current defendant, RF 1347. The majority suggests the use of such evidence is proper given the trial court found RF 1347 "ratified" the contract between RMR and the original park owner. Ratification, however, concerns a principal agreeing to be bound by the unauthorized acts of an agent. (*City of Brentwood v. Department of Finance* (2020) 54 Cal.App.5th 418, 436 (*City of Brentwood*).) The original park owner was not RF 1347's agent. It seems clear, therefore, that

5

when the trial court found there was ratification, it was referring to the new park owner ratifying the act of its park manager, who the court found agreed to be bound by the contract in 2010.  Further, the majority's use of extrinsic evidence from 2002 is not supported by *City of Brentwood, supra*, 54 Cal.App.5th 418, which notes that ratification does not modify *the terms* of a contract; it says nothing about the extrinsic evidence interpreting those terms.

Neither would I declare that a Court of Appeal can resolve the veracity of the testimony of witnesses on a contested issue while simultaneously noting the trial court made no factual findings on that issue.  Doing so overlooks the fact that a trial court can choose to simply disbelieve three, five, or even 100 witnesses who testify consistently if it so chooses.  To quote a recent opinion by the majority's author:  "Venerable precedent holds that, in a bench trial, the trial court is the 'sole judge' of witness credibility.  [Citation.]  The trial judge may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so.  [Citation.]  The fact finder's determination of the veracity of a witness is final.  [Citation.]  Credibility determinations thus are subject to extremely deferential review. . . .  [¶] . . . [¶]  These binding principles are traditional and sound.  Fact finders see and hear witnesses.  The finder of the facts has a view appellate courts lack.  That view is better.  This appellate deference is long-standing." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582–583.)  To hold that an appellate court may presume how a trial court would have resolved an open question of witness *credibility*—even on uncontradicted testimony—raises serious questions left unaddressed by the majority's single citation to a seventy-year-

6

old court of appeal case that did not address that specific issue. (See *Walpole v. Prefab Manufacturing Co.* (1951) 103 Cal.App.2d 472, 481.)

Thus, I would avoid these matters that are not necessary to resolve this dispute, were not discussed below, were not relied on by the trial court in its ruling, and were not argued on appeal.



BIGELOW, P. J.