Filed 3/3/23  LR Partners, L.L.C. v. Charter Communications Inc. CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LR PARTNERS L.L.C., <br><br> Plaintiff and Respondent, <br> v. <br> CHARTER COMMUNICATIONS INC. et al., <br><br> Defendants and Appellants. | A165058 <br><br> (San Francisco City & County Case No. CGC-18-565706) |

Spectrum Pacific West, LLC ("Spectrum") appeals from a judgment entered in favor of LR Partners, L.L.C. ("LR Partners") after the trial court granted LR Partners' motion for summary adjudication and ruled in LR Partners' favor on the key contract interpretation issue presented by the motion.  Specifically, the court determined that the 1969 agreement between the parties' predecessors, which includes a provision that has obligated Spectrum to make revenue share payments to LR Partners annually, included an express term of duration which was not terminable at will by Spectrum.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.    The 1969 Contract

The contract underlying this dispute was entered into on September 24, 1969, between Spectrum's predecessor, cable television operator Southern

1

California Cable Television ("SCCTV"), and LR Partners' predecessor, real estate developer UTLX, Inc. ("UTLX") (contract referred to as the "UTLX Agreement" or "Agreement"). In the Agreement, SCCTV agreed to construct, install, maintain, and operate a community antenna television system ("CATV") throughout certain undeveloped real property in the city of Thousand Oaks (the "Property"). The Property consisted of approximately 2582.6 acres in Thousand Oaks being developed by UTLX.

The UTLX Agreement is ten pages without exhibits. It contains five enumerated sections each with additional subsections.

Section 1 ("Recitals") contains various recitals which the parties acknowledge "constitute the premises upon which this Agreement [was] based and the reasons for its execution." Section 1.1 recites UTLX's representation to SCCTV that "UTLX is the beneficial owner of the Property. . ." Section 1.2 notes that UTLX has advised SCCTV that UTLX has entered into an agreement with the Donald B. Bren Company ("Bren") providing for Bren's option to purchase approximately 827 acres of the Property for residential and commercial development. That subsection further states that UTLX is obligated to "use its best efforts to provide an operating CATV system available to residential purchasers" in the Bren portion of the Property and to make that area cable ready as well. Section 1.3 recites SCCTV's representation to UTLX regarding its experience in the construction, installation, and operation of CATV systems and its desire to do so for the Property.

Section 2 ("The Nature of the CATV System and Service to be Provided by SCCTV") sets forth SCCTV's representations and warranties. Section 2.1 states that SCCTV is "the holder of a non-exclusive franchise from the City to provide CATV System and service therefor to an area including the entire of

the Property, as authorized by Ordinance No. 28 adopted by the City's Council on April 6, 1965. . . . All operation of the CATV System and all service in connection therewith by SCCTV for the Property will be in accordance with the terms and conditions of said Ordinance." The referenced ordinance, which is the non-exclusive franchise granted SCCTV by Thousand Oaks, is an exhibit to the Agreement. Section 2.2 provides that SCCTV "will construct, install, maintain and operate for the entire of the Property a complete and operating CATV system" and provide associated services, which include delivering to each subscriber at least 10 television channels and FM radio reception.

Section 3 ("Construction and Installation of the CATV System") covers standards for the system's construction and installation. Section 3.1 explains that SCCTV will construct and install the system in a good and workman like manner. Section 3.2 requires UTLX to give SCCTV not less than 30 days' notice prior to commencing construction of any streets upon the Property or any major and secondary streets required under the Bren agreement. This section further adds that UTLX "shall use its best efforts to cause Bren or any other developer purchasing portions of the property from UTLX to give similar notice to SCCTV with respect to construction of any in-tract roads or utilities with respect to which UTLX has no obligation or responsibility. UTLX shall also grant to SCCTV all easements, licenses and permissions necessary for SCCTV to install any portion of the system in such major and secondary streets which are the obligation of UTLX and any other streets constructed by it and will use its best efforts to cause Bren or such other developer to grant to SCCTV similar rights necessary to SCCTV's construction and installation of the System upon the Property."

3

Section 4 ("Operation of the CATV System; Division of Revenues") discusses payment obligations between the parties. In Section 4.1, UTLX agrees to pay SCCTV an initial connection fee of $35 per connected household. Section 4.3, which is the payment provision giving rise to the parties' instant dispute, states: "During the term of this Agreement, SCCTV will pay UTLX an amount equal to 16-2/3 percent of all revenues, whether received from subscribers or from others, received by SCCTV from or with respect to the Property for CATV System" service for the covered property. The payment obligation is subject to certain carveouts not at issue in this appeal. Section 4.4 provides that the amounts due under sections 4.1 and 4.3 are to be "paid annually on January 31 of each year based upon connections to the [CATV] System during the previous twelve months and all revenues received with respect to the Property from the [CATV] System for the previous twelve months."

Section 5 ("General Provisions") – the final enumerated section of the Agreement – includes the following provision in section 5.1, the meaning of which the parties dispute:

> Subject to the next sentence, this Agreement and all of the rights and obligations of the parties hereunder shall remain in effect for so long as SCCTV, or its successors and assigns, shall continue to be franchised by the City or other appropriate governmental agency to provide CATV System service to said City and shall inure to the benefit of and be binding upon UTLX, SCCTV and their respective successors and assigns.

Section 5.1 further provides:

> In the event that SCCTV, its successors or assigns, shall have discontinued operation of the System for any reason other than bona fide repair thereof diligently and continuously pursued, and shall not have resumed operation thereof within thirty (30) days after written

4

request from UTLX that said service be resumed, thereupon by written notice from UTLX to SCCTV of its election to do so, UTLX shall be entitled to receive absolute title to, and thereafter to operate, all portions of the system upon or through the Property, including without limitation, all cable, connections, terminals, easements, licenses, and other permission for use of the system free and clear of any further right, title or interest of SCCTV, its successors or assigns, whatsoever in such portion of the System, such event constituting a termination of all title or interest of SCCTV or its successors or assigns in and to such portion of the System, and the vesting of such title in UTLX, its successors and assigns forever.

There is no fixed term of years in this section or elsewhere in the Agreement.

## B.    1969-1990

In the years following the Agreement's execution, various entities succeeded UTLX and SCCTV. In 1971, UTLX changed its name to Langmoor Corporation ("Langmoor"). In 1971, SCCTV was acquired by and merged into Storer Cable, Inc. ("Storer"). In 1988, Ventura County Cablevision, Inc. ("Ventura Cable") acquired Storer and assumed its obligations under the UTLX Agreement.

There appears to be no dispute between the parties that UTLX and its successor provided the easements, licenses, permissions, and notifications necessary under the Agreement, as well as paid the cable provider the $35 per household connection fees. There is also no dispute that during this time frame (1969-1990), SCCTV and its successors paid UTLX and its successor the annual revenue share payments under section 4.3 of the Agreement. According to LR Partners, UTLX successor Langmoor began receiving payments from SCCTV successor Storer in 1978, nine years into the Agreement, "when the amounts due as a percentage of cable revenue under

5

§ 4.3 of the UTLX Agreement exceeded the initial connection fees due under § 4.1 of the Agreement."

### C. The 1990 Modification of the UTLX Agreement

By 1990, an approximately 504.97-acre portion of the Property known as the "Lang Ranch Property" was carved out by UTLX successor Langmoor and transferred to another developer, the Lang Ranch Company.

On September 1, 1990, the Lang Ranch Company and SCCTV successor Ventura Cable entered into a separate agreement for the provision of cable services on the Lang Ranch Property. Like the UTLX Agreement, this new agreement, entitled "Compensation Agreement Lang Ranch" (the "Lang Ranch Agreement"), was designed to facilitate CATV services to subscribers on the Lang Ranch Property.

Under the Lang Ranch Agreement, Ventura Cable agreed to pay Lang Ranch Company a fixed $600 per connection as well as a percentage of gross revenue – 7-1/2 percent – received from delivery of its cable services on the Lang Ranch Property. The parties agreed that the payments made by the cable company to the developer under the agreement were "considered 'just compensation' to the owner for the use of the easements upon the Property." Unlike the UTLX Agreement, which had no fixed term limit for payments from cable provider to developer, the Lang Ranch Agreement stated that Ventura Cable's obligation to pay the 7-1/2 percent compensation to Lang Ranch Company was to last approximately 20 years, commencing on the date of the contract, which was September 1, 1990, and terminating December 31, 2010, subject to earlier termination if Lang Ranch Company or other developers failed to satisfy their various obligations under the contract.

The Lang Ranch Agreement required the Lang Ranch Company to cause Langmoor to acknowledge that the UTLX Agreement had no

6

application to the Lang Ranch Property, and that Langmoor had no right under the UTLX Agreement to any compensation or other consideration arising from the cable system constructed on the Lang Ranch Property. Accordingly, on September 1, 1990, Langmoor executed a separate two-page "Acknowledgement" concurrent with and incorporated by the Lang Ranch Agreement in which Langmoor stated that it had transferred a portion of the Property (which had been subject to the UTLX Agreement) to the Lang Ranch Company. Langmoor further agreed that the "Lang Ranch Property ha[d] been transferred to Lang Ranch Company . . . [and was] no longer subject to the UTLX Agreement." Langmoor affirmed that it was "entitled to no compensation of any nature from [Ventura Cable] as successor-in-interest to [SCCTV] under the UTLX Agreement, with respect to the construction, operation and maintenance of a cable television system upon the Lang Ranch Property or any revenue of any nature derived by [Ventura Cable] with respect to such a system."

Thus, under the Lang Ranch Agreement and Acknowledgment, the parties modified the UTLX Agreement to effectively limit its reach to the portions of the original Property which were already developed and not acquired by the Lang Ranch Company.

### D.    1991 to Current Dispute

In 1991, Langmoor sold and assigned its interest and rights under the UTLX Agreement to LR Partners.

In 1996, TCI West, Inc. acquired the company that owned Ventura Cable. Three years later, Adelphia acquired TCI West. In 2007, Time Warner Cable, Inc. ("TWC") assumed operations from Adelphia, and a direct subsidiary, Time Warner Cable Pacific West LLC ("TWC Pacific"), held the local franchise to provide cable services in Thousand Oaks. That same year,

TWC Pacific obtained a state-issued franchise pursuant to the California Digital Infrastructure and Video Competition Act ("DIVCA"), which became effective in 2008. DIVCA required cable operators to transition from local to state-issued franchises. (Pub. Util. Code, § 5800 et seq.) The franchise granted by Thousand Oaks expired when the state-issued franchise became effective. In 2016, Charter Communications, Inc. ("Charter") acquired TWC Pacific, but TWC Pacific continued as the entity that held the state-issued franchise to provide services in Thousand Oaks. Charter did not assume any of TWC Pacific's obligations under the UTLX Agreement.

Again, there is no dispute that through 2016, Spectrum's predecessors paid LR Partners and its predecessors the annual section 4.3 payments. Between 1990 and 2016, this sum amounted to approximately $2.3 million. The last annual payment to LR Partners was made in June 2016, based on revenue received by TWC Pacific in 2015.

In October 2017, after months of exchanges between the parties regarding nonpayment of the annual revenue shares for 2016, outside counsel for LR Partners requested payment. LR Partners advised that it would have no alternative to filing suit to enforce is rights under the UTLX Agreement if no response was received. In April 2018, LR Partners filed a breach of contract claim against the cable provider seeking to enforce LR Partners' alleged rights to the section 4.3 annual payment.

In August 2018, outside counsel for Spectrum's predecessor TWC Pacific wrote LR Partners, advising that TWC Pacific had terminated the UTLX Agreement in April 2018 when, in its view, it had denied any obligation to make payments under the Agreement and refused to make further payments to LR Partners. TWC Pacific reiterated its termination of the Agreement and any obligation for it to abide by its terms.

As of November 2018, TWC Pacific was renamed Spectrum Pacific West, LLC.  According to Spectrum, in light of LR Partners' payment demands, it began to investigate the current ownership or control of the Property subject to the UTLX Agreement.  Spectrum asserts that its predecessors had paid LR Partners based on the mistaken belief that LR Partners and its predecessors owned or controlled the Property subject to the UTLX Agreement, as modified by the 1990 Acknowledgment, and that such payment was required for continued access to the Property.  Based on its investigation, the cable provider determined LR Partners no longer owned or controlled the Property and certain rights of way had been transferred to the public or third parties.  As a result, Spectrum states it terminated the UTLX Agreement.

Spectrum, now SCCTV's successor, currently holds the state-issued franchise to operate on the Property covered by the UTLX Agreement.  It is undisputed that Spectrum has not provided and does not provide any cable services on, or receive cable-related revenues, from any property owned by LR Partners.  It is also undisputed that LR Partners does not currently own or control the Property subject to the UTLX Agreement.

### E.    Trial Court Proceedings

After litigation between the parties commenced in April 2018, LR Partners amended the complaint to insert TWC Pacific in place of the first doe defendant.  Upon TWC Pacific's name change to Spectrum, all further pleadings by the cable provider were made by Spectrum.  In January 2019, Spectrum filed a cross-complaint against LR Partners, seeking among other relief a declaration that the UTLX Agreement was terminated or unenforceable.

9

Following discovery, the parties stipulated to the precise geographic scope of the UTLX Agreement, as modified by the 1990 Lang Ranch Agreement and the Acknowledgment, and to the distinct payment streams that arose under the agreements. The parties also entered a stipulation regarding the method of calculating the amount owed under the UTLX Agreement and amounts payable based on that method. Soon thereafter, the parties filed cross-motions for summary adjudication on the meaning of the UTLX Agreement, which the trial court heard and ruled on in April 2021.

The trial court granted LR Partners' motion for summary adjudication in its entirety and largely denied Spectrum's cross-motion as moot. The court concluded that Spectrum owed a duty to make the 16-2/3 percent payments under the UTLX Agreement. The court noted that under section 5.1 of the Agreement, "the parties agreed that the UTLX Agreement shall remain in effect 'for so long as SCCTV, or its successors and assigns, shall continue to be franchised by the City or other appropriate governmental agency to provide CATV System service to said City.'" Rejecting Spectrum's contention that such payments were conditioned on LR Partners' ownership of the property subject to the UTLX Agreement, the court explained that the plain language of the Agreement did not condition payment on such ownership and found no term reasonably susceptible to such a construction. The court also rejected Spectrum's argument that the Agreement was indefinite in duration, reasoning that there was nothing indefinite about section 5.1's provision that the agreement would run so long as SCCTV continued to be franchised by Thousand Oaks or another appropriate governmental agency. Further, it found the UTLX Agreement was not reasonably susceptible to Spectrum's assertion that the city or a local entity had to be the franchising government agency and concluded the state-issued franchise under which Spectrum had

10

operated since 2008 qualified.  Based on these rulings, the trial court further concluded the Agreement was not vague, ambiguous, or insufficiently definite.

In light of the trial court's summary adjudication order and the earlier stipulations regarding how annual payments under the Agreement were to be calculated, LR Partners and Spectrum stipulated to a damages and interest calculation, subject to Spectrum's right to appeal the court's liability determination.  The trial court entered final judgment based on the stipulation.  This appeal followed.

**DISCUSSION**

Spectrum contends that the 1969 UTLX Agreement is a "textbook one of indefinite duration" which it was entitled to, and did, terminate at will when it took over the cable system in Thousand Oaks in 2018.  The cable provider argues that the trial court erred in construing the Agreement to have an "implied time limit" tied to its maintenance of a government-issued franchise or permit to operate its cable system within Thousand Oaks.  In Spectrum's view, this court should reverse the trial court's final judgment that Spectrum is liable to LR Partners for breach of contract.  We disagree and conclude the Agreement contains an express durational term that governs its termination.

## A.    Applicable Law

An order granting a motion for summary adjudication, like a summary judgment order, is reviewed de novo.  (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)

"Our mission in every contract case is to discern and effectuate the contracting parties' mutual intent.  We begin with the words of the contract. The nature of the contract and the surrounding circumstances can inform

11

those words.  [Citation.]  [¶]  We gain insight by divining the purpose of the contract.  Understanding what the parties were trying to accomplish can illuminate their contractual language." (*RMR Equipment Rental, Inc. v. Residential Fund 1347, LLC* (2021) 65 Cal.App.5th 383, 392 (*RMR*).)  "[T]he language of a contract must be construed in the context of the instrument as a whole and all the surrounding circumstances." (*Admiral Ins. Co. v. Superior Court* (2017) 18 Cal.App.5th 383, 388; *Stockton v. Stockton Plaza Corp.* (1968) 261 Cal.App.2d 639, 644 [in interpreting a contract, the court may look to the surrounding circumstances to decide what is reasonable and what the parties intended by the language used].)

"Generally speaking, contract interpretation is a legal rather than a factual question.  [Citation.]  It is a judicial function to interpret a written contract, unless the interpretation turns upon the credibility of extrinsic evidence.  [Citation.]  [¶]  A trial court properly admits evidence extrinsic to the written instrument to determine the circumstances under which the parties contracted and the purpose of the contract." (*RMR*, *supra*, 65 Cal.App.5th at p. 392.)  When no extrinsic evidence is in conflict, reviewing courts undertake their own construction of the agreement.  (*Id.* at p. 393.)  When the material extrinsic evidence is undisputed, reviewing courts independently determine the meaning of the contract.  (*Ibid.*)

B.    **Determining Contract Duration**

In *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union, Local 16* (1968) 69 Cal.2d 713 (*Consolidated*), our Supreme Court set out a three-step analysis for determining a contract's term of duration.  First, courts look for an express duration provision in the contract.  If one exists, we enforce it according to its terms.  Second, if the contract does not have an express provision, we look to the intention of the parties to imply a duration.

12

Third, if we find neither an express nor an implied term, we construe the term of duration to be a reasonable time. (*Id.* at pp. 723–731.) If a contract is of indefinite duration, it may be terminated after a reasonable time and with adequate notice. (See *Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 18 (*Asmus*).)

### 1. The UTLX Agreement's Duration Provision

"California cases have long recognized that a contract may, by its express terms, provide for a term of duration of indefinite length and without specific limitation, tied not to the calendar but to the conduct of the contracting parties." (*Zee Medical Distributor Association, Inc. v. Zee Medical, Inc.* (2000) 80 Cal.App.4th 1, 7 (*Zee*).) "The general California rule appears to be that a contract is not fatally defective merely because it does not specify a time presently definite for its termination [citation]. The rule is that if the contract is to remain in effect so long as one continues to perform or act in a certain manner . . . the agreement is sufficiently certain to be vital." (*Zimco Restaurants, Inc. v. Bartenders and Culinary Workers Union, Local 340, AFL-CIO* (1958) 165 Cal.App.2d 235, 237 (*Zimco*).)

For example, in *Great Western Distillery Products v. John A. Wathen Distillery Co.* (1937) 10 Cal.2d 442, our Supreme Court held that " '[t]he failure to *specifically* limit the duration of the contract did not fatally affect it and did not give rise to a right to terminate the contract at will without a liability for damages.' " (*Id.* at pp. 446–447.) The contract at issue was an agreement for the distribution for distilled spirits which provided that " '*as long as the plaintiff purchases and continues to purchase* from the defendant all of its John A. Wathen Distillery Company warehouse receipts for whiskey,' " the defendant would limit its sales to others in California. (*Id.* at 444–445, emphasis added.) The Court deemed this provision an express term

13

of duration which was sufficiently certain and valid. (*Id.* at p. 447 [" ' "As a general proposition the failure of an executory contract to state a time presently definite for its termination does not render it void for uncertainty." ' "].) Two more recent cases reflecting this rule that a contract may remain in effect so long as one continues to perform or act in a certain manner are instructive.

In *Lura v. Multaplex, Inc.* (1982) 129 Cal.App.3d 410 (*Lura*), the plaintiff successfully procured customers for the defendant's business. (*Id.* at p. 412.) Once the plaintiff secured the accounts, he had no further obligation to service them. (*Ibid.*) In return for the plaintiff's work, the defendant promised to pay him a 5 percent commission, based upon the defendant's sales to the accounts. (*Ibid.*) The parties "neither discussed nor reached an understanding as to the duration of the agreement." (*Ibid.*) After a few years, the defendant sought to terminate the commission payments, even though the "customers solicited by appellant continued to conduct business with respondent." (*Ibid.*) The trial court determined that the contract was of indefinite duration, and therefore terminable by either party upon notice after a reasonable time. (*Id.* at p. 413.)

In reversing the trial court, the court of appeal reasoned that the defendant had an ongoing obligation to pay the commission so long as he continued selling to the plaintiff's accounts. (*Lura, supra,* 129 Cal.App.3d at p. 413.) The court explained: "Since [the defendant's] obligation to [the plaintiff] is contingent upon its sales to the accounts he secured, the agreement is of a limited duration – until [the defendant] stops selling to those accounts." (*Ibid.*) Further, the " 'mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would

14

do violence to the expressed intent of the parties.' " (*Ibid.*)  In determining duration, the court of appeal recognized that "[t]he important factor, then, is not whether the contract fails to specify a termination date, but whether there is an ascertainable event which necessarily implies termination." (*Id.* at pp. 414–415.)  The agreement at issue provided for such an event: the termination of sales to the specified accounts. (*Id.* at p. 415 ["where an obligation is conditioned upon an event connected with the subject matter of the contract, the obligation continues until that event occurs"].)

In *RMR*, *supra*, 65 Cal.App.5th 383, the defendant, an owner of a mobile home park, entered into a service contract with the plaintiff, an owner of water trucks, to be the park's exclusive supplier of drinking water beyond what the park's wells could produce. (*Id.* at pp. 385–386.)  The parties based the contract duration on performance and contingencies, not on the calendar, and no expiration date was set. (*Id.* at p. 389.)  "Rather, the contract would end when the park no longer needed trucked water, either because it put in enough new wells or because it succeeded in connecting to a public water system." (*Ibid.*)  Relevant language in the parties' agreement stated: " 'RMR Water Trucks will be guaranteed water delivery to Paradise Ranch as long as the park needs water to supplement its well water production or another supply of water becomes available.' " (*Ibid*, italics omitted.)  After thirteen years and new park ownership, the park began hauling water in a truck it had bought, and the plaintiff confronted park managers, asserting a violation of the agreement. (*Id.* at p. 390.)  When the plaintiff rejected the park's offer to be an as needed supplier at the original contract price, the park stopped asking the plaintiff for water. (*Ibid.*)  The plaintiff then sued for breach of contract. (*Ibid.*)  The trial court found the defendant had breached the agreement but refused the plaintiff's request for a damages award from the

15

date of breach to the date of trial, which was a span of about four years, because the contract contained no express duration term and was thus terminable at will on reasonable notice. (*Id.* at p. 391.) The court determined reasonable notice was three months and awarded damages accordingly. (*Ibid.*) In reversing the trial court on damages, the court of appeal held the contract's provision – " 'RMR Water Trucks will be guaranteed water delivery to Paradise Ranch *as long as the park needs water to supplement its well water production or another supply of water becomes available*' " – was an express duration provision. (*Id.* at p. 393.) As explained by the court, "This contract was not terminable at will. It was to continue as long as the park needed water to supplement its well production: until it obtained another supply of water by connecting to some larger water system or by drilling more wells that obviated the need for trucks. Therefore it was error to limit damages for breach to an arbitrary three-month term." (*Ibid.*)

As in *RMR*, our analysis also begins and ends with the plain language of the UTLX Agreement, which is not silent as to duration. Section 5.1 of the Agreement sets forth an express duration provision: "[T]his Agreement and all of the rights and obligations of the parties hereunder shall remain in effect for so long as SCCTV, or its successors and assigns, shall continue to be franchised by the City or other appropriate governmental agency to provide CATV System service to said City and shall inure to the benefit of and be binding upon UTLX, SCCTV and their respective successors and assigns." This duration provision applies to "all of the rights and obligations of the parties hereunder," which no party disputes encompass the section 4.3 annual revenue share payments. It establishes that such obligations shall remain in effect so long as Spectrum continues to be franchised by Thousand Oaks or "other appropriate governmental agency" to provide cable services to

16

Thousand Oaks. In conditioning termination on Spectrum's ongoing cable franchise, the Agreement provides an ascertainable event for termination which makes it one of definite duration. (*Asmus, supra*, 23 Cal.4th at p. 17 ["courts have interpreted a contract that conditions termination on the happening of a future event as one for a definite duration or time period only when 'there is an ascertainable event which necessarily implies termination' "].) Accordingly, like the contracts in *Lura* and *RMR*, the UTLX Agreement was not indefinite and thus not terminable at will. The trial court did not err in concluding the Agreement was of definite duration.

Spectrum argues that the contract "is a textbook example of an agreement for an indefinite duration" because it does not contain an express durational term or even a termination clause. There is no dispute that the Agreement does not include a term of years. As Spectrum notes, even the trial court recognized the Agreement does "not appear to have a specific definite term" and added that "it just seems a little odd that [the Agreement] . . . like the Energizer [B]unny, just keeps going and going and going." Case law, however, clearly establishes that "[a] contract is not fatally defective merely because it does not provide a time presently definite for its termination. [Citation.] Words which fix an ascertainable event, by which the term of a contract's duration can be determined, make the contract definite and certain in that particular." (*Bradner v. Vasquez* (1951) 102 Cal.App.2d 338, 344; see also *Zimco, supra*, 165 Cal.App.2d at p. 237 [a contract to remain in effect so long as one continues to perform or act in a certain manner is a sufficiently certain agreement].) As we have discussed, section 5.1 of the Agreement contains an explicit term of duration tied to Spectrum's ongoing cable franchise. When the franchise ends, Spectrum's obligation to make the section 4.3 payments to LR Partners shall cease.

17

Spectrum also relies on various extrinsic evidence to support its view that the parties understood and agreed the UTLX Agreement would run for an indefinite period. These include a memorandum dated September 23, 1969, from the UTLX signatory to the Agreement, in which he writes that the Agreement "will result in our realizing a modest income from an *indefinite period* with very little risk or financial commitment." (Emphasis added.) In a 1978 internal review memo, a Langmoor executive noted that the UTLX Agreement "does not have any termination date." We need not and consider these documents or the others cited as the durational language in section 5.1 of the Agreement is explicit. (*Hollingsworth v. Heavy Transport, Inc.* (2021) 66 Cal.App.5th 1157, 1177 [" 'The mutual intent of the parties is ascertained from the contract language, which controls if clear and explicit.' "])

### 2. Implied Durational Terms

Spectrum argues that its contract termination remains proper and effective because "[e]ven if the Court were to undertake a more searching review for an implied durational term," there are "only two 'reasonable' timeframes," both of which have expired. In light of our conclusion that the UTLX Agreement contains an express duration that must be enforced according to its terms, we need not undertake any further review to imply a term of duration in the UTLX Agreement. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 524 (*Lockyer*) ["where ' "contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further" ' "].) However, even if we were to conclude that there was no express term of duration, we would not imply either durational term urged by Spectrum.

18

### a. *Continuing Private Ownership of Property*

Spectrum contends the Agreement could only reasonably remain in effect so long as the development remained private. In the cable operator's view, "the object and nature of the contract, its text, as well as its surrounding circumstances, confirm it was fundamentally premised upon the development remaining private property, and its duration could only reasonably last so long as the development was private." Spectrum explains that since none of the Property remains private today and its once private roads and ways have since been dedicated to the public, it no longer needs LR Partners' or any other private party's authorization for access. It contends that implying a duration after the Property is no longer privately held means "Spectrum and its customers would be required to pay LR Partners indefinitely for the privilege of accessing public rights of way, where they already pay the State for that privilege" through franchise fees.

As noted, if a contract does not have an express durational provision, we look to the intention of the parties to imply a duration. (*Consolidated*, *supra*, 69 Cal.2d at pp. 723–731.) Here, we could not imply the Agreement's duration was based on the development remaining private property. The parties do not dispute, at minimum, that SCCTV entered the Agreement with UTLX to gain access to subscribers located on the then UTLX-owned property. But Spectrum's contention that the parties' exchange was for limited access premised upon the Property remaining private is not reflected in the language of the Agreement, the undisputed facts, or any other evidence proffered by Spectrum. Under the Agreement, SCCTV agreed to pay a share of annual revenue for access to customers in the area so long as it held a franchise to operate in that area. The language reflects an intent for the cable provider to share revenues from the subscribers on the Property so long

19

as it remained franchised to serve them.  It does not tie the Agreement's duration to private ownership of the Property.

Spectrum argues that implying any durational term that extends to after the Property is no longer privately held would be unreasonable since the Agreement would live on even after the reason the parties entered the contract had disappeared.  We disagree.  As noted, SCCTV entered the agreement with UTLX to gain access to subscribers.  To this day, Spectrum (as SCCTV's successor) remains the cable provider for the subscribers located within the Property and continues to collect revenue from those subscribers.  In short, Spectrum continues to reap benefits from its predecessor's arrangement with UTLX.  In this context, implying a duration beyond the Property's private ownership is not unreasonable.  (Cf. *Lura*, *supra*, 129 Cal.App.3d at pp. 414–415 [plaintiff's success in obtaining accounts for defendant constituted consideration entitling him to compensation though plaintiff had no further duty to service accounts and the only obligation remaining was that of defendant to pay the compensation].)

Spectrum further argues LR Partners' "perpetual revenue scheme" is akin to the arrangement the Second Circuit found untenable in *Town of Readsboro v. Hoosac Tunnel & W.R. Co.*, 6 F.2d 733 (2d. Cir. 1925) (*Readsboro*), which our Supreme Court discussed in *Consolidated*, *supra*, 69 Cal.2d at pp. 725–726.  In *Readsboro*, *supra*, 6 F.2d 733, a town and company entered an agreement with no express terms of duration to build and share in the costs of maintaining a bridge for a highway both the town and company would use.  (*Id.* at p. 734.)  After some 20 years, the railway company stopped using the bridge, which was unable to bear its new equipment.  (*Ibid.*)  When the town asked the company to bear half the expense for bridge repairs, the company refused.  (*Ibid.*)  Observing the contract was "unlimited in time," the

20

court found the town's view that the company was bound forever to pay maintenance expenses to be untenable. (*Id.* at p. 735.) Since no time was expressly fixed in the agreement, the court looked to the circumstances of the agreement and determined the shared maintenance costs could only last so long as the company used the bridge. (*Ibid*.) There was no reason for the company to continue to pay for something it no longer used. (*Ibid*.)

*Readsboro* is readily distinguishable. While the UTLX Agreement does not include any specified term of years, it does include an explicit term of duration tied to Spectrum's maintenance of a government-issued cable franchise in section 5.1. Such express language obviates the need for the type of additional inquiry the court engaged in in *Readsboro*. (*Readsboro, supra,* at p 735 ["Had the parties expressed the intention to make a promise for perpetual maintenance, we should, of course, have nothing to say; their words would be conclusive."]; *Lockyer, supra,* 107 Cal.App.4th at p. 524.) Further, unlike the railway company which stopped getting use out of the bridge, Spectrum continues to obtain some benefit from having received access to the Property from LR Partners' predecessors via the UTLX Agreement.

### b. *Expiration of Local Franchise*

Spectrum also contends the UTLX Agreement could only reasonably remain in effect so long as Spectrum operated pursuant to a franchise it received from the city of Thousand Oaks or an equivalent local authority: "[B]ased on the 'nature' of the agreement, its terms, the 'surrounding circumstances' underlying its formation, and the parties' contemporaneous communications, the agreement could only reasonably remain in effect for so long as the cable operator held its existing City franchise or an equivalent local authorization." Spectrum argues that section 5.1 is not an express durational limit but rather a necessary condition for the cable operator to

21

carry out its obligations. It adds that section 5.1's reference to some "other appropriate governmental agency" can only reasonably encompass another local franchising authority, since only local governments franchised cable operators when the Agreement was executed. Thus, Spectrum reasons any implied durational term tied to the cable operator's franchise expired, at the latest, when Spectrum obtained its state-issued franchise. There is no disagreement between the parties that since DIVCA, the state has been the government agency to issue cable franchises to operators like Spectrum. Nor is there any dispute that Spectrum has maintained its state-issued franchise since 2008.

We cannot imply the Agreement's duration based on a city-issued franchise or one from a local authority, as the UTLX Agreement's express language controverts any such implication. Again, section 5.1 states that the Agreement shall remain in effect "so long as SCCTV, or its successors and assigns, *shall continue to be franchised by the City or other appropriate government agency* to provide CATV System to said City . . ." (Emphasis added.) Thus, the Agreement explicitly provides for the continuation of contractual obligations so long as SCCTV or its successors hold a franchise from the city or "any appropriate government agency." In using the term "appropriate government agency," the contract does not restrict the franchising authority to the city of Thousand Oaks or another local entity, and we decline to infer such an intent. (*Lockyer, supra*, 107 Cal.App.4th at p. 524 [intention of parties to be inferred, if possible, solely from contract's written provisions].) Understanding the words of a contract "in their ordinary and popular sense," as we must in construing a contract (*id.* at pp. 525–526), there is no ambiguity that the state is an "appropriate government agency" within the meaning of section 5.1. Thus, the expiration of the cable

22

operator's city franchise cannot serve as grounds for implying a durational term either.

Spectrum argues that such an interpretation of section 5.1, which recognizes the state as an appropriate franchising authority, is unreasonable. Noting that an implied term must be a fixed or ascertainable event connected with the subject matter of the contract, it says "there is nothing fixed, certain, or even ascertainable about an end date keyed to the loss of some unknown and unidentified – and possibly yet to be invented – authorization." We disagree. There is nothing abstract about the state's issuance of a franchise for the relevant area. Spectrum applies at regular intervals to the state for these grants of authority to provide cable to specific territories, and the franchise takes effect and expires on dates certain. We are not persuaded that keying duration to a government-issued permit with such ascertainable features is unreasonable.

### D.    Uncertainty of the UTLX Agreement

Alternatively, Spectrum contends that if the UTLX Agreement has not already terminated, it is "simply far too uncertain to be enforced" as it is indefinite with respect to "how long Spectrum must continue to pay LR Partners for nothing." In its view, the trial court's judgment "that the agreement shall continue as long as Spectrum can provide cable services" is one the parties could not have imagined and that cannot be used "to pinpoint any logical, definite end date," rendering the Agreement void and enforceable.

We disagree. An agreement must be definite enough for a court to determine the "scope of the duty and limits of acceptable performance." (*Robinson & Wilson, Inc. v. Stone* (1973) 35 Cal.App.3d 396, 407.) As section 5.1 expressly provides that Spectrum's obligation to make annual payments to LR Partners shall continue as long as it is franchised to provide cable

23

services in Thousand Oaks, the Agreement is sufficiently certain.  (See *Zee*, *supra*, 80 Cal.App.4th at p. 7; *Zimco*, *supra*, 165 Cal.App.2d at p. 237.)

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.

A165058/*LR Partners LLC v. Charter Communications Inc. et al.*